Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 1 of 40

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SARATOGA**

---

BRIGID ("BRIDIE") FARRELL, an individual

          **Plaintiff,**

-against-

THE UNITED STATES OLYMPIC & PARALYMPIC COMMITTEE, a Business Entity of Form Unknown; US SPEEDSKATING, a Business Entity of Form Unknown; THE UNITED STATES OLYMPIC EDUCATION CENTER, a Business Entity of Form Unknown, THE SARATOGA WINTER CLUB, a Business Entity of Form Unknown; and ANDREW ("ANDY") GABEL, an individual.

          **Defendants.**

---

Index No.: _____

Date Filed:_____

Plaintiff designates Saratoga County as the venue for trial

**SUMMONS**

Venue is based on one of Defendant's principal place of business located in Saratoga Springs, New York

**Child Victims Act Proceeding**
**22 NYCRR 202.72**

---

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of York); and in this case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

**A COPY OF THIS SUMMONS WAS FILED WITH THE CLERK OF THE COURT, SARATOGA COUNTY ON _____ IN COMPLIANCE WITH CPLR §§305(a) AND 306(a).**

**[SIGNATURE ON FOLLOWING PAGE]**

1

Dated:  July 30, 2020

Respectfully Submitted,

BARNES & THORNBURG, LLP

By: _Michael G. Battle_

MICHAEL A. BATTLE (1885128)
mbattle@btlaw.com
MICHELLE BRADFORD (4003042)
mbradford@btlaw.com
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006-4623
Telephone: (202) 408-6922
Facsimile: (202) 289-1330

CHARLES G. LA BELLA (1044155)
charles.labella@btlaw.com
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 321-5000
Facsimile: (619) 284-3894

*Attorneys for Plaintiff, Brigid Farrell*

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 3 of 40

TO:

**THE UNITED STATES OLYMPIC & PARALYMPIC COMMITTEE**
27 S Tejon St.
Colorado Springs, CO 80903

**US SPEEDSKATING**
5662 South Cougar Lane
Kearns, UT, 84118

**THE UNITED STATES OLYMPIC EDUCATION CENTER**
N/K/A: Northern Michigan University Olympic Training Site (OTS):
1401 Presque Isle Avenue
Marquette, MI 49855

**THE SARATOGA WINTER CLUB**
30 Weibel Avenue
Saratoga Springs, NY 12866

69 King Rd.
Saratoga Springs, NY 12866

**ANDREW ("ANDY") GABEL**
1081 Knollwood Rd
Lake Forest, IL 60045

825 S. Waukegan Rd., Ste A8
Lake Forest, IL 60045

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 4 of 40

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SARATOGA**

---

BRIGID ("BRIDIE") FARRELL, an individual

                               **Plaintiff,**

-against-

THE UNITED STATES OLYMPIC & PARALYMPIC COMMITTEE, a Business Entity of Form Unknown; US SPEEDSKATING, a Business Entity of Form Unknown; THE UNITED STATES OLYMPIC EDUCATION CENTER, a Business Entity of Form Unknown, THE SARATOGA WINTER CLUB, a Business Entity of Form Unknown; and ANDREW ("ANDY") GABEL, an individual.

                               **Defendants.**

---

Index No.: _____

**COMPLAINT:**

<u>**Child Victims Act Proceeding
22 NYCRR 202.72**</u>

Plaintiff, Brigid ("Bridie") Farrell (hereinafter referred to as "Plaintiff," or "Bridie Farrell") by her attorneys, Barnes & Thornburg LLP, respectfully alleges for her complaint the following:

## I.  INTRODUCTION

1.  This case arises from the serial grooming and sexual abuse of Bridie Farrell, a nationally ranked US speedskater, by her then 33-year-old speedskating teammate and mentor, Defendant, Andrew ("Andy") Gabel (hereinafter referred to as "Defendant" or "Gabel"), when Bridie Farrell was 15 years old.  The sexual abuse of Bridie Farrell occurred over the course of seven (7) months and was committed at various speedskating facilities and at times when Gabel and the other named Defendants, institutions, and authorities within the speedskating sport, were entrusted with Plaintiff's safety and well-being.  Despite the other named Defendants' knowledge

that Gabel had previously sexually abused young female speedskaters, they turned a blind eye to his predatory behavior and permitted Bridie Farrell to become Gabel's next victim.

2.     The sexual abuse of Plaintiff could have been prevented had Defendants, the United States Olympic Committee ("USOC"), the United States Olympic Education Center ("USOEC"), US Speedskating ("USS"), the Saratoga Winter Club ("SWC") (Collectively referred to as "Corporate Defendants"), and the individual Defendant Gabel, complied with their responsibility for the care and protection of minors in Plaintiff's position.  Ignoring specific and credible allegations known to them that Gabel had sexually abused female athletes under the age of 18, the USOC, the USOEC, USS, and the SWC officials chose to turn a blind eye toward Defendant Gabel's conduct and consistently rewarded, promoted, and protected Gabel, placing their desire for Olympic success before their obligation to protect Plaintiff and other young competitive athletes.  These young athletes in exchange pushed themselves past the point of injury and exhaustion, often sacrificing their own physical, mental, and emotional well-being, for the Defendants' success, fame, and material profit.

3.     Despite having the power, authority, ability, and mandate to do so, Defendants the USOC, the USOEC, USS, and the SWC failed to protect their young female athletes, including Bridie Farrell, with the result that Gabel sexually abused her and others repeatedly over several years.  In spite of explicit warnings and their awareness of significant red flags indicating Gabel's predatory and abusive behavior, the Defendants never restrained, punished, nor disciplined Gabel in any way.  Instead, individually and collectively, they promoted and protected Gabel in their shared quest for Olympic medals and other indicia of competitive success in the sport of speedskating.  In fact, prior to his abuse of Bridie Farrell, USS installed Gabel as one of several USS athlete representatives, to whom complaints were to be reported about sexual molestation and

5

Case 1:20-cv-01178-FJS-CFH Document 2 Filed 09/24/20 Page 6 of 40

abuse, the very type of predatory behavior in which Gabel himself was engaged. Defendant, USS, allowed Gabel to hold this and other positions of authority and trust, in spite of its knowledge that Gabel had previously been accused of raping and sexually abusing young athletes. Gabel's position as a watchdog against predatory sexual harassment and conduct resulted in granting him continued access to vulnerable, young, aspiring athletes with a USS sanctioned mantle of trust and confidence that made complaints against him more difficult to lodge and therefore less likely to occur.

4.      As a direct result of the abuse she was subjected to at the hands of Gabel, Bridie Farrell has suffered from depression, fear, and anxiety including periodic suicidal thoughts, which continue to impact her adversely to this day. For years, Plaintiff knew that what Gabel had done to her was wrong. Because of Gabel's influential and protected position within the USOC, the USOEC, USS, and the SWC, however, Plaintiff believed that no one within those governing institutions would investigate diligently any complaint filed by her, or take action against Gabel. This fact, coupled with specific and repeated warnings to remain silent, accompanied by threats, from Gabel to Plaintiff, deterred Plaintiff for many years from reporting what Gabel had done to her.

## II.      PROCEEDING IN ACCORDANCE WITH CPLR 214-G AND 22 NYCRR 202.72

5.      This complaint is filed pursuant to the Child Victims Act (CVA) 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), CPLR 214-G and 22 NVCRR 202.72. The CVA permits victims and survivors of childhood sexual abuse in the State of New York a one-year period in which to pursue otherwise time-barred claims. Prior to the passage of the CVA, Plaintiff's claims were time-barred the day she turned 23 years old. The enactment of the CVA permits Bridie Farrell to pursue restorative justice in New York State for the first time since becoming fully aware of, and being able to act upon, her status as a surviving victim of sexual abuse.

### III.     PARTIES

6.     The Plaintiff, Bridie Farrell, is an adult woman currently residing in the State of New York. Bridie Farrell was born in January 1982. At the age of six years old, Bridie Farrell began training as a member of Defendant, the SWC in Saratoga Springs, New York, under the tutelage of renowned speedskating coach Patrick ("Pat") Maxwell. By the age of 13 Bridie Farrell was a nationally ranked speedskater. She competed in the 1998, 2002, 2006, and 2014 Olympic Trials. She also held three American records in speedskating: the 1500m, 3000m, and 3000m relay. It was in the course of her training as a speedskater that 15-year-old Bridie Farrell was sexually abused by Defendant Gabel from in or about June, 1997 through in or about January, 1998. Serial sexual abuse and molestation of the Plaintiff by Gabel took place in connection with events and with travel to or from events and practice for events, that were hosted, sponsored, sanctioned, supervised, and/or endorsed by, and/or under the mandate of Defendants the USOC, USS, and the SWC. The abuse often took place on premises controlled by or operated under the auspices of the Defendants.

7.     Upon information and belief, Defendant, the USOC, is a corporation with its principal place of business and headquarters located in Colorado Springs, Colorado. Upon information and belief, at all relevant times, the USOC conducted business as the "U.S. Olympic Committee" or the "United States Olympic Committee." In June 2019, the U.S. Olympic Committee changed its name to the United States Olympic and Paralympic Committee. All events relating to this matter occurred before its name change, and Defendant is referred to in this Complaint as the USOC.

8.     The USOC is a federally chartered nonprofit corporation, reorganized under the Ted Stevens Amateur Sports Act, enacted in 1978. As advertised on its website, "[t]he USOC has two primary responsibilities in its oversight of Olympic and Paralympic sports in the United States.

The first is to generate resources in support of its mission, which is to help American athletes achieve sustained competitive excellence. The second is to ensure organizational resources are wisely and effectively used to that end." Furthermore, Defendant the USOC professes in the name of superior athletic performance that it is "committed to creating a safe and positive environment for athletes' physical, emotional, and social development and to ensuring that it promotes an environment free of misconduct." The reality is that the USOC created and tolerated an environment in which young and vulnerable athletes, such as Plaintiff, often have been at the mercy of adults who, rather than having provided a safe and secure training environment, have generated and maintained an environment in which young athletes routinely and repeatedly have been sexually abused and victimized.

9. At all times relevant to the events in this complaint, Defendant the USOC operated several United States Olympic Training Centers ("OTCs"), including training facilities located in Colorado Springs, Colorado and Lake Placid, New York. As the facility in Lake Placid was designated as a U.S. Olympic Training Center, individuals present in the facility at the request of the Defendant, or operating there under its supervision, were required to follow all protocols, mandates, policies, bylaws, rules, and/or practices of Defendant the USOC.

10. At all times relevant to Plaintiff's Complaint, Defendant the USOC was required to ensure that the Lake Placid OTC provided adequate protection and supervision for the minors training and competing at the facility, including the Plaintiff. This included ensuring reasonable safety protocols for minors, reasonable supervision of minors, adult chaperone training, and oversight procedures for all adults serving as chaperones with responsibility for the minors, including training with respect to the identification and reporting of sexual abuse.

8

11.     At all times relevant to Bridie Farrell's abuse by Gabel, the USOEC operated a training and education center facility located in Marquette, Michigan. At all times relevant to this complaint, the USOEC was under the control and supervision of, and, upon information and belief, was funded through, the USOC and/or USS. As the USOEC was designated officially as a training and education center, where young athletes came to train and be educated in one location, those present were required to follow and comply with all protocols, mandates, policies, bylaws, rules, and/or practices of Defendants the USOC and USS.

12.     At all times relevant to Bridie Farrell's abuse by Gabel, Defendants, the USOC and USS, were required to ensure that the USOEC provided adequate protection and supervision for the minors training and competing at the facility, as well as reasonable security protocols ensuring the safety of those minors, reasonable supervision, adult chaperone training, and oversight procedures for all adult chaperones who had oversight responsibility for these minors, including training on the identification and reporting of sexual abuse. In addition, Defendants, the USOC, the USOEC, and USS were required to receive, investigate, and report any instance of sexual abuse of a minor.

13.     Defendant Gabel often resided at the USOEC, which was located on the campus of Northern Michigan University. USS would invite talented speedskaters to train at the USOEC, in Michigan. Gabel was a regular fixture at the Michigan facilities, occupying a coveted corner room in the dormitory area where athletes resided. Gabel was also compensated from time to time by and through the USOEC, for services as an assistant, while he also trained and competed at the USOEC, as a means to reward and promote Gabel. Defendants had a duty to protect minor athletes training at the USOEC, and Defendants were aware of the specific and credible allegations that Gabel sexually abused young girls at the USOEC.

9

14.     Upon information and belief, at all relevant times, USS was a nonprofit organization recognized by the USOC and the International Skating Union ("ISU") as the governing body for the sport of speedskating in the United States.   USS has its national headquarters in Salt Lake City, Utah at the Utah Olympic Oval, in addition to offices located in Kearns, Utah.

15.     Upon information and belief, USS previously was known as the United States International Speedskating Association.   In 2002, the United States International Speedskating Association merged with the Amateur Skating Union to create a unified governing body for the sport of speedskating in the United States.  USS is a member of the USOC and the ISU and receives funding and other support from the USOC.

16.     According to its website, the mission of USS is to "be one of the premier speedskating organizations in the world through excellence in leadership, development and performance.  To date, USS has won 88 Olympic Winter Games medals." In addition to national training programs, USS is "responsible for the grassroots development of speedskating.  The organization supports athlete development camps along with coaching and officials' training across the country."

17.     At all times relevant to Bridie Farrell's abuse by Defendant Gabel, Defendant USS operated an official training center, called the Pettit National Ice Center, located in Milwaukee, Wisconsin.

18.     At all times relevant to Bridie Farrell's abuse by Defendant Gabel, Defendant USS was required to ensure that the Pettit National Ice Center provided adequate protection and supervision for the minors training and competing at the facility, as well as reasonable security protocols ensuring the safety of those minors, and reasonable supervision, training, and oversight

procedures for all adult chaperones who had oversight responsibility for these minors, including training on the identification and reporting of sexual abuse. Despite this duty, Defendant Gabel sexually abused young girls while they were training at the Pettit National Ice Center.

19.     Upon information and belief, at all times relevant to the Complaint, Defendant the SWC was a nonprofit organization located in Saratoga Springs, New York. According to its website, "[t]he Saratoga Winter Club has always been affiliated with national and international organizations, such as the [Northern New York Speedskating Association], the Amateur Skating Union of the United States, the United States Speedskating Association, and the ISU." The SWC is a feeder club for the Olympic sport of speedskating and is an acknowledged breeding ground for aspiring Olympic athletes. Both Defendants the USOC and USS rely on the SWC and other regional clubs to identify and recruit Olympic speedskaters. To date, the SWC has been the home base for several acclaimed Olympic speedskaters, including Moria D'Andrea, Kristen Talbot, David Tamborino, Erin Porter, and Trevor Marsicano. It attracted Olympic athletes, such as Defendant Gabel, to its location for training, due to the high level and top caliber coaches who volunteered there, including Maxwell.

20.     Plaintiff was a dues-paying member of Defendants the SWC and USS. Plaintiff paid, as she was required to do, entrance fees to USS, in order to compete in the trials for the Olympic Games. While no annual dues were required to be paid by Plaintiff directly to the USOC, Plaintiff paid the USOC in order to stay at the Olympic Training Center.

21.     Defendant Gabel is a four-time, short track speedskating, U.S. Olympian who competed in the 1988, 1992, 1994, and 1998 Winter Olympic Games. Defendant Gabel was awarded a silver medal as a member of the 1994 Olympic 5000m Short Track relay team.

11

22.     Defendant Gabel was also a member of the National Short Track (Speedskating) Team, from 1979 to 1998, and a member of the National Long Track Team, from 1981 to 1989. Gabel won more than 75 international medals as a member of the U.S. World Short Track Team, from 1987 to 1998.  He also competed in 12 World Championships.

23.     From in or about 1989 through 2002, Defendant Gabel periodically participated in an official capacity in US Speedskating.  In 1989, Gabel was an athlete training at the USOEC in Michigan and was paid as an assistant.  In 1994, he was elected to the US Speedskating 15-member governing Board of Directors as an athlete representative.   During his time as an athlete representative with USS, Gabel continued to participate in national and international competitions. He secured a place on the United States Olympic Team during the 1998 Olympic qualification trials in Lake Placid, New York.  Defendant Gabel was elected to the Office of Vice President of Defendant USS in 1999 and became USS's sixth President in 2002.  Gabel was the Director of Figure Skating and Short Track Speedskating for the 2002 Olympic Winter Games.

24.     In 1998, the Associated Press characterized Gabel as "something of a geriatric marvel in a sport that now normally is dominated by much younger skaters."  He was often referred to as "Grandpa" or "the Godfather" by his younger teammates.  In April 2003, Gabel was elected to the Speedskating Hall of Fame, a status and recognition which he retains to date.

25.     During his tenure as a competitive athlete in speedskating, Gabel was at times compensated by or through the USOEC and USS for services rendered as an assistant at the USOEC facilities in Michigan.  While a compensated USOEC assistant and while he served as a USS athlete representative, Gabel exploited his position and influence to sexually abuse young girls.  He also exploited his position, relationships, and speedskating accomplishments to prevent any meaningful inquiry into his activities.  To be sure, this culture of ignoring allegations of sexual

abuse of minor athletes and protecting the Olympic institutions at all costs was rooted deep within the Olympic institutions and its leadership.

26.     As late as 2011, when allegations of the years of sexual abuse of minor athletes and how Olympic officials ignored those allegations spilled out in public, Olympic officials continued to place the protection of the "Olympic Institutions" above the safety of young athletes.  In fact, there was a concerted effort by the USOC executives to block even the publication of a handbook to counter the sexual abuse of athletes.  Malia Arrington, then a USOC executive in charge of abuse prevention, and Scott Blackmun, then chief executive of the USOC, affirmatively sought to prevent publication of an abuse handbook, for fear that doing so would prompt athletes, who had been abused, to come forward to report the abuse, with consequences of liability for the Olympic institutions.

27.     In December 2011, Arrington wrote to Blackmun:

> [W]hile several NGB's [National Governing Bodies] expressed that the (sexual abuse prevention) handbook sets the proper focus… there is also a perception that publishing the handbook will increase the risk of liability.

Will Hobson and Steven Rich, Every Six Weeks for More Than 36 Years, WASH. POST (Nov. 17, 2017), https://www.washingtonpost.com/sports/every-six-weeks-for-more-than-36-years-when-will-sex-abuse-in-olympic-sports-end/2017/11/17/286ae804-c88d-11e7-8321-481fd63f174d_story.html.

28.     Upon information and belief, Gabel currently resides in Las Vegas, Nevada. During the time he sexually abused Bridie Farrell, Gabel at times resided in Saratoga Springs, New York.

## IV.    VENUE

29.    Venue is proper in Saratoga County because Defendant the SWC is a domestic corporation authorized to transact business in New York, with its principal place of business located in Saratoga Springs, New York.

30.    Venue is proper because Saratoga County is the county in which Gabel resided and in which occurred a substantial number of the acts, or omissions to act, giving rise to the Plaintiff's claims.

31.    Venue is proper because Plaintiff Bridie Farrell currently resides in Hudson, New York, and resided in Saratoga Springs at the time the acts or omissions giving rise to her claims against the Defendants occurred.

## V.    FACTUAL ALLEGATIONS APPLICABLE TO PLAINTIFF'S CLAIMS

### A.    Young Bridie Farrell Develops as a Speedskater at the SWC

32.    Plaintiff Bridie Farrell was born in January 1982, in a small rural town in upstate New York.  Bridie Farrell was one of six children.  The Farrell family home was not far from facilities used by the SWC skating facilities.  Bridie Farrell began skating with the SWC at a very young age, when her older brother became interested in speedskating, having seen clips of the 1988 Calgary Winter Olympic speedskating competition.  In this small upstate community, the SWC and its leader, Pat Maxwell, were well-known and trusted by local residents.  Pat Maxwell was also well-known and trusted by Plaintiff's family; Plaintiff's brother skated while Pat Maxwell was the head coach at the SWC.  Believing Bridie Farrell would be safe, her parents supported her continued training at the SWC over the years.  Pat Maxwell became Plaintiff's coach when she was just six years old.

33.    Young Bridie Farrell's skill and fame as a speedskater developed rapidly.  When Bridie Farrell was only ten years old, a local newspaper featured Plaintiff as a future Olympian

14

training at the SWC. In sixth grade, young Bridie Farrell competed and placed third in the Amateur Skating Union ("ASU") Age Group Nationals. Bridie Farrell continued to train, and her speedskating continued to flourish at the SWC. Plaintiff and her parents believed that, with the right coaching and mentoring, she could develop into a genuine Olympic athlete and champion.

34.      In 1994, 12-year-old Bridie Farrell first met Gabel through the SWC. Gabel came to Saratoga for the Olympic Trials, which were to be held in Lake Placid, New York, in January 1994.

35.      Gabel developed and maintained a close personal and professional relationship with Coach Maxwell over the years and frequently resided in Maxwell's home, while training with the SWC. Pat Maxwell, a volunteer coach at the SWC, was recognized in the speedskating world as one of the premier coaches in the United States. Several internationally ranked speedskaters regularly came to the SWC to train under Maxwell. Given his internationally recognized coaching prowess, Maxwell was, at all times, closely aligned with the USOC and USS, for which he served as an official speedskating coach during several Olympics. The SWC was among a handful of speedskating programs in the United States, from which talented speedskaters would be identified and recognized. Gabel was training under Maxwell at the same time as Maxwell coached several young aspiring speedskaters at the SWC, including Bridie Farrell.

36.      By 1994, Defendant Gabel was already an internationally known and ranked speedskater. Plaintiff admired Gabel and aspired to be an Olympic speedskater like him. When she met Gabel, Plaintiff dreamed of being an Olympian.

**B.      Defendant Gabel's Grooming of Bridie Farrell and Her Family**

15

37.     In 1997, Gabel moved to Saratoga Springs, New York, to again train under Maxwell for the 1998 Olympic Trials.  Maxwell had been named as an Olympic Team Coach for the 1998 Olympic Games.

38.     It was in 1997 that the 33-year-old Gabel targeted 15-year-old Bridie Farrell to be a victim for his sexual depravities.

39.     Bridie Farrell and her parents trusted the SWC and Coach Maxwell implicitly, inasmuch as Bridie Farrell had been training there since she was six years old.  They knew Maxwell had coached her and taken note of her talent at a young age.  What they did not know or appreciate was that, in the world of speedskating, Gabel had been the subject of allegations and rumors of illegal sexual relationships with young speedskaters.  These allegations were reported to and known by, among others, officials associated with Defendants the USOC, the USOEC, and USS. Maxwell, who was closely aligned with these organizations and was on committees and boards associated with them, was either blinded by his close personal and professional relationship with Defendant Gabel, or, because of Gabel's speedskating status, refused to acknowledge the fact that Gabel was a wolf in sheep's clothing around under aged female speedskaters like Bridie Farrell. At all relevant times, Bridie Farrell and her parents reasonably relied upon the acts and representations of the SWC, and of its agents, servants, and volunteers and reasonably believed that Pat Maxwell was an agent who had been vetted, screened, and approved by Defendant the SWC and the other Defendants.

40.     Plaintiff often attended practice with the SWC and traveled to USS sponsored events, without her parents.  At all relevant times, Bridie Farrell and her parents believed that the SWC and Pat Maxwell, as its agent, would exercise such due care as would a parent of ordinary

prudence in comparable circumstances, when Defendant the SWC and Pat Maxwell assumed the supervision, care, custody, and control of Plaintiff.

41.    Bridie Farrell's parents would not have permitted her to be placed under the supervision of, nor in the care, custody, or control of, Gabel, Maxwell, or the SWC, if the Defendants had disclosed their knowledge that Gabel had a history of grooming and sexually abusing young girls and that Gabel was, therefore, patently not trustworthy and, as a sexual predator, posed a grave danger to Bridie Farrell.

42.    When the 33-year-old Gabel returned to Saratoga in the summer of 1997, he began grooming Bridie Farrell by devoting attention to her. Given Gabel's fame and success, Plaintiff was surprised that he took any interest in befriending her. Gabel talked to Plaintiff about their shared love of speedskating, began to teach Plaintiff about body positioning, and encouraged her to mimic him on the ice. Gabel talked to Plaintiff about the importance of good coaching and of an athlete's commitment to the sport. Plaintiff was flattered and motivated by Gabel's interest in her and desired to impress him inasmuch as he was one of the most successful and highly respected speedskating athletes competing at the time.

43.    In the world of competitive speedskating, one highly coveted skill is for skaters to be able to "bend" their skate blades without the reliance on rink or coach assistance. Gabel would often bend young Bridie Farrell's skates, making her believe his assistance would level the playing field with her competition. Gabel also told Plaintiff that older and more experienced female speedskaters were jealous of Plaintiff because of all the attention and support Gabel gave her. Gabel treated Plaintiff as though she was important and special to him, sought her out at practice, and sat next to her in the locker room. Gabel quickly became a part of Plaintiff's daily life and was wholly integrated into her passion for and commitment to speedskating.

44.     At the same time, Gabel also sought to endear himself to Plaintiff's parents.  He requested and took several piano lessons from Plaintiff's mother, who was a part-time piano instructor.  He requested and received medical advice from Plaintiff's father, who was a physician. Gabel presented himself in a positive light, and Plaintiff's parents, particularly Plaintiff's father, were impressed with Gabel's achievements, including his college education and athletic accomplishments, and encouraged Plaintiff to emulate Defendant Gabel.

45.     Starting in the summer of 1997, Plaintiff's parents permitted Gabel to provide transportation for Bridie Farrell to and from their home, picking up and dropping off Plaintiff from speedskating training and practice sessions at least three days a week.  One of the Plaintiff's teammates was also present and transported by Gabel.  Gabel, however, would frequently take Plaintiff to her home subsequent to dropping off her teammate, whether or not doing so was the most direct or convenient route.

C.     **Defendant Gabel's Sexual and Mental Abuse of Bridie Farrell**

46.     Not long after Defendant became Plaintiff's transportation to and from practice, Gabel turned left, instead of the customary right he normally took to Plaintiff's home.  Gabel pulled into a dead-end street, where he turned off the car.  Gabel turned to Plaintiff and asked if he could kiss her.  Plaintiff, unsure how to respond and not knowing what Gabel might do to her if she refused, remained silent.  Gabel then unbuckled his seatbelt, turned his body towards Plaintiff, leaned over, and kissed her.  Plaintiff remained buckled into her seat.  When Gabel finished kissing Plaintiff, he turned the car on, buckled his seatbelt, and drove approximately 500 meters to Plaintiff's home.  This kiss was Bridie Farrell's first kiss in a sexual setting.  Plaintiff knew she had not agreed to kiss Gabel, but she feared his reaction if she reported the encounter.

47.     The day following the kiss, Gabel treated Plaintiff consistent with his previous demeanor toward Plaintiff at practice.  Thereafter, however, Gabel began to increase the time he spent with Plaintiff, picking her up from home to take her to lunch, and often taking her to secluded locations, such as Saratoga Lake and the Saratoga Battle Field, where he would sexually abuse her.  All the while, Gabel continued to present a wholesome image to Bridie Farrell's parents to ensure continued access to Plaintiff.

48.     In his continued effort to maintain and strengthen the trust of her parents, Gabel engaged in conversations with them when he dropped Plaintiff off after practice.  To the young, impressionable Plaintiff, the fact that her parents thought highly of Gabel made her more determined to earn his respect, to maintain the secrecy of what he was doing to her, and to not disclose the abuse to her parents or any third party.  The Plaintiff's determination to earn Defendant's respect by maintaining the secrecy of his predatory advances included her fear of disclosing to her parents that Defendant was abusing her in the hallway of their home.

49.     In the fall of Bridie Farrell's sophomore year of high school, Gabel began providing her with transportation, from her school to the home he rented with another Olympic speedskater, in Saratoga Springs.  In his rented home in Saratoga Springs, the Defendant continued his sexual abuse of Bridie Farrell.  He would unbutton Plaintiff's pants and coach her to lie on her back or side in his bed while he fondled her, often inserting his fingers into Plaintiff's vagina.  At times, he would place Plaintiff's hands on his erect penis.  For Bridie Farrell, who had not previously engaged in sexual activity of any kind before meeting Gabel, these abusive acts were at all times inappropriate, new, unknown, confusing, suffocating, and sometimes painful.

50.     During this period, Gabel continued to make Plaintiff believe that he wanted to help her become an Olympic athlete and that he was important to her athletic development.

Approximately two to three times per week, Gabel would pick Bridie Farrell up at school to take her to the Vernon Arena ice rink, located in Saratoga Springs. Many times, however, instead of taking Plaintiff to skate, he would take her to his home and sexually abuse her. While Plaintiff appreciated Defendant's interest in her skating, she dreaded when Gabel came to pick her up, because she never knew if he was taking her to skate or to his home to molest her.

51.     In addition to giving her his attention, Gabel's grooming of Plaintiff included giving her gifts. At the 1998 Olympic trials, Gabel bought Bridie Farrell a jig, a costly speedskating blade-sharpening tool; earlier he had given her a pair of Oakley sunglasses. Plaintiff was afraid she would lose Gabel's attention and support if she told anyone what he was doing to her and about the abuse she was suffering.

52.     In fact, however, even before Gabel met the Plaintiff for the first time, many within the USOC, the USOEC, USS, and the SWC already knew about Gabel's reputation for grooming and molesting young female speedskaters. Indeed, once in the locker room of the SWC, a fellow skater joked that Dr. Farrell, who had advised Gabel about a groin injury, was not the only Farrell who had seen Gabel's groin. Similarly, at the USOEC, witnesses have recounted how similar comments were made by Gabel himself, relating to his abuse of other young female skaters. As a result, Gabel had several well-known nicknames in the speedskating community, reflecting a knowledge and awareness of his abusive and sexually predatory conduct toward young girls. These names included "The Womanizer," "Big Ball Gabes," "Old Man Gabes," "Grandpa Gabes," and "Dirty Gabes."

53.     During the fall of Bridie Farrell's sophomore year of high school, Gabel's control over and predatory conduct toward her extended beyond sexual abuse to include emotional abuse. For example, Gabel told her that she was not permitted to attend post homecoming dance parties

without his consent.  Gabel further instructed her that she could only go to her high school's homecoming dance if she called him as soon as she returned home.  Plaintiff, not wishing to anger Gabel, arranged to have her mother pick her up promptly after the homecoming dance, so she could expeditiously return home to call Gabel, as demanded.

54.     Gabel also required Plaintiff to sit beside him in the locker room at the Saratoga Springs ice skating rink, where male and female skaters would change in one room.  Gabel insisted on this seating arrangement after Plaintiff intentionally endeavored to choose a seat further away from Defendant to distance herself from him in the locker room.

55.     Gabel's emotional abuse of Plaintiff extended to her diet and weight.  In the fall of 1997, when they were laying in his bed together, Gabel pinched the skin under Plaintiff's stomach and told Plaintiff that if she ever dreamed of being an Olympian, she would need to "lose the fat." At the time, 15-year-old Bridie Farrell weighed 119 pounds.  That day, Plaintiff recalls mentally committing to employing excessive efforts toward changing her eating habits in unhealthy ways, to ensure that she would not gain weight.  Specifically, at Gabel's instruction, Plaintiff began drinking veggie juice as her main source of nutrition.  As a direct result of Gabel's comments about her weight, Bridie Farrell developed multiple eating disorders and severely restricted her intake of food.  Several years later, Plaintiff revealed to a teammate that she would force herself to throw up when she believed she had eaten too much.  The teammate reported Plaintiff's behavior to Coach Pat Maxwell, who was concerned and proceeded to have a discussion with Plaintiff about her eating habits.

56.     Gabel relentlessly exploited the opportunities he had to isolate and abuse Bridie Farrell.  Beginning in the winter of 1997, and leading up to the 1998 Olympic trials, Plaintiff and other members of the SWC, including Gabel and Pat Maxwell, traveled to the Lake Placid OTC

to train.  While they were at the OTC, Gabel frequently found reasons for Plaintiff to get into his car and transport her to isolated locations where he would kiss and fondle her on the OTC grounds.

57.     During the 1998 Olympic trials, Gabel stayed at Art Devlin's Olympic Motor Inn ("the Inn").  Gabel picked up Plaintiff from the Lake Placid OTC, where she was staying with other athletes, drove her back to the Inn, and instructed Plaintiff to accompany him to his room.  Once in his room, Gabel kissed and fondled Plaintiff, as he had grown accustomed to doing.  During the encounter, when Gabel noticed that Plaintiff's eyes were open and that she was not responding to Gabel, Gabel told Plaintiff in a mocking tone that she still did not know how to kiss.  After abusing Plaintiff, Gabel drove her back to the Lake Placid OTC.

58.     At the 1998 Olympic trials, Plaintiff did not watch Gabel's 1000m time-trial race.  Gabel subsequently confronted Plaintiff and told her she had "lost out" by not being there to watch him.  When Plaintiff tried to explain that she had her own races on which to focus later the same day, Gabel dismissed her and suggested to Plaintiff that she did not stand a chance at making the team.  Plaintiff was devastated by Gabel's apparent lack of confidence in her and struggled to perform in her own races.

59.     The last time Gabel sexually abused Bridie Farrell was in March of 1998, in Marquette, Michigan.  Both prior to and following his final sexual abuse of Plaintiff, however, Defendant regularly and recurrently abused her emotionally.  For example, when Gabel saw Plaintiff at speedskating events, he invariably badgered Plaintiff to tell him whether she had told anyone about his sexual abuse of her.  In March 1998, Gabel saw Plaintiff at the Age Group National Championships in Saratoga Springs and demanded to know if she had told anyone about "them."  In 2000, at the World Championships in Shefield, England, Gabel, who was then an officer with USS, confronted Plaintiff and demanded reassurance that she had not told anyone

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 23 of 40

about his abusive relationship with her. Plaintiff, who knew Gabel was powerful and highly ranked within USS, was further intimidated by these interactions, in which Gabel demanded she not disclose his behavior.

60.     As a direct result of Gabel's emotionally and sexually abusive conduct, Plaintiff developed severe depression that has included regular suicidal thoughts. She has battled eating disorders for years, including both anorexia and bulimia. Bridie Farrell has received extensive therapy and has taken various anti-depressant medications since 2001. She has suffered suicidal ideations and even sought assistance from a family member to assist her to commit suicide. To date, Plaintiff continues to experience fear, anxiety, depression, feelings of guilt, and suicidal thoughts.

61.     Gabel's sexual molestation of Plaintiff contributed to her engaging in a series of abusive and dysfunctional relationships with other individuals. Plaintiff continues to face emotional challenges, including baselining what "normal" dating and sexual behavior is and what intimacy means.

**D.     Defendants' Knowledge of Gabel's History of Sexual Abuse of Minors**

62.     At the time of Bridie Farrell's sexual and emotional abuse by Defendant Gabel in 1997 and 1998, Defendants the USOC, the USOEC, USS, and the SWC were already aware of Gabel's predilection for exploiting and abusing underage girls.

63.     Gabel had a patterned, systematic way of grooming underage female speedskaters he targeted for abuse. In fact, speedskaters who trained with Gabel at the USOEC at Northern Michigan University were aware of Gabel's methodical and abusive technique. They have recounted that Gabel would befriend the parents of the young females and would demonstrate disproportionate interest in the athletic abilities of the skaters. Gabel would offer to hone their

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 24 of 40

technique, take them for rides in his car, and offer himself as a mentor for their athletic career development.  As parents became comfortable with Gabel, he would begin spending more time with the girls alone.  Gabel often bragged about his sexual conquests in locker rooms at practices and skating events scheduled, sponsored, hosted, or supported by the Defendants.  His propensity for and attraction to girls many years his junior was well known within the speedskating community.

64.     Between as early as 1989 and 2000, at the height of his career and prominence in US Speedskating, Gabel regularly engaged in the molestation of underage female speedskater hopefuls.  Each of Gabel's female victims trained, as had Bridie Farrell, within USS organizations and feeder organizations, and each aspired, as had Plaintiff, to become an Olympic speedskater, in the mold and relying on the skill and success of Defendant Gabel.

65.     Defendants the USOC and USS had a primary mission: to win Olympic Medals through the athletes they selected, trained, and sponsored.  To accomplish this mission, the Defendants promoted Gabel, long after they were first on notice, and knew or should have known, of Gabel's predilection to molest underage girls.

66.     As early as 1989, an incident was brought directly to the attention of Defendant the USOC and its agents involving a young female American speedskater competing in Italy at an international event.  Gabel, who participated in this USS sanctioned event, reportadly coerced a young girl (Jane Doe #1) into having sexual relations with him.  The 1989 incident was reported to USS officials and was again reported the next year, when there was a second reported incident involving Gabel and a different young skater.

67.     In April 1990, Defendant USOC was again directly put on notice of Gabel's molestation of underage speedskater hopefuls.  According to a 1990 investigative report, which

24

was published in 2018 by the Committee to Restore Integrity to the USOC ("Committee to Restore Integrity"), the USOC received complaints by both a male Olympic speedskater and a USA National Team Wrestling Coach that Gabel had sexually abused teenage girls at the USOEC training site in Marquette, Michigan. According to the report, "the USOC took no action against Gabel, who would thereafter go on to sexually abuse children at the Olympic Training Centers in New York and Michigan, as well as on several of the USOC sanctioned international trips, including the Olympics in Albertville, France and Lilehammer, Norway."

68.     Regarding the training site in Marquette, Michigan, located on the grounds of Northern Michigan University, the Committee to Restore Integrity reported that an Olympic boxing Coordinator/Coach observed a young girl (Jane Doe #2) leaving Gabel's dormitory in the early morning hours. He observed and reported that the girl, dressed in night clothes, was visibly shaken and in tears. The report also refers to the incident in Italy and confirms that it too was officially reported.

69.     The victim, Jane Doe #2, was a minor at the time. The Coordinator/Coach wrote and submitted a full report of what he saw. The Coordinator/Coach also reminded officials of a report he made a year earlier to his Olympic supervisors, involving Jane Doe #1 and Gabel, while in Italy competing at an international competition.

70.     Upon information and belief, at the time Gabel abused Jane Doe #2, he was a paid coach and administrator for Defendants the USOEC and USS at the USOEC facility in Michigan.

71.     Despite Jane Doe #2's age and the troubling circumstances reported regarding the incident involving Jane Doe #1 in Italy a year earlier, upon information and belief, Jane Doe #2 was never interviewed by the USOEC officials about the incident at its Marquette training facility in Michigan, nor were Jane Doe #2's parents notified about the incident. Instead, because of

Gabel's status as an Olympic speedskater and an official of Defendant USS at the time, the Defendants and their leadership turned a blind eye toward and willfully, or recklessly, ignored Gabel's sexually predatory behavior. His success as a U.S. Olympian and a US speedskater valued him as an athletic asset to be protected for the continuing benefit of the U.S. Olympic hierarchy over and above the health and safety of the young female athletes he preyed upon under and during the care of the USOEC.

72.     The facts set forth above relating to Jane Doe #2 were disclosed to the Northern Michigan University Public Safety Department, as well as to the USOC. The Northern Michigan University Public Safety Department, apparently in coordination with a local police department, conducted an investigation. Upon information and belief, officials never notified the minor's parents of the incident, and, perhaps even more shocking, neither the minor victim nor Gabel were interviewed in connection with the investigation. The investigation was closed shortly after it began.

73.     Despite these red flags, the officials sought to cover up and whitewash the allegations for years. Indeed, it wasn't until March 2013, nearly a quarter century after the first instances of abuse by Gabel occurred, that USS hired the law firm of Sidley Austin LLP to conduct "an investigation" into the Gabel allegations. Neither the written report, its findings, nor its investigative work product have ever been made public. This is true despite the numerous allegations involving Gabel and his abuse of under aged female athletes.

74.     Based upon reports of witnesses who were interviewed by Sidley Austin attorneys, the investigative agenda was not to establish the truth about Gabel, but to minimize and bury the incidents so the Olympic Defendants could avoid responsibility for their failure to protect young

female athletes from his abuse.  The investigative report, commissioned at the request of USS, remains hidden from public scrutiny to this day by USS.

75.     Because the USOC and USS did little to investigate, document, or at least warn minor athletes of the dangers, the facts alleged regarding Defendant Gabel's felony transgressions simply vanished, as a formal matter, within the organizations.  Had these allegations, observations, and warning signs in 1989 and 1990 not been covered up and ignored, or given the serious attention from officials that they merited and required, Bridie Farrell would not have been yet another victim of Defendant Gabel.

76.     In addition to Plaintiff and Jane Does #1 and #2, Gabel had a series of abusive relationships with other minor Olympic hopefuls.  Upon information and belief, these include Jane Does #3, #4, and #5.

77.     In spite of their knowledge of his predatory behavior, Defendant the USOC recklessly permitted Gabel to serve on the organizing committee for the 2002 Winter Olympics in Salt Lake City, and the other Defendants did not object to Gabel's inappropriate service in that official capacity.

78.     Based on Gabel's well-known reputation for preying upon and grooming young girls, as well as the information brought to the attention of speedskating officials thereafter regarding Gabel's predatory conduct toward young girls and his sexual exploitation of them, a reasonable person could and would conclude that the USOC and the other named Defendants knowingly or recklessly disregarded the sexual molestation of Bridie Farrell and others.  Instead, the USOC and the other named Defendants chose to protect their organizations' reputation and public standing, and that of Gabel, over young female athletes, such as the Plaintiff.  Moreover, after concluding his career as a competitive speedskater, Gabel went on to become a regularly

appearing commentator on ABC's Wide World of Sports, ESPN, and Outdoor Life Network, thereby enhancing his personal fortune and reputation, as well as those of Defendants the USOC, the USOEC, USS, and the SWC.

### E.     Defendants' Failure to Take Action to Protect Bridie Farrell and Others

79.     Defendants had the ability to protect Bridie Farrell and others from the abuse these girls suffered at the hands of Gabel.  As a result of significant scandals in the 1990's concerning athletic doping and the unlawful practices attendant to it, Defendants the USOC and USS implemented strict procedures to ensure athletes were not engaged in the use of illegal substances. If the Defendants, in order to ensure a "safe and positive environment for emotional and social development free of misconduct" (in the words of the USOC website), had promulgated and implemented similar safeguards against sexual abuse, the sexual abuse of minors, including the abuse of the Plaintiff alleged in this Complaint, would not have occurred.

80.     Defendants had the ability to implement a program to protect young girls from sexual abuse.  For example, the U.S. Anti-Doping Agency ("USADA"), which began operations in 2000, requires athletes to provide thorough "Whereabouts" information to enforce anti-doping. Athletes who fail to submit to testing can face suspension from the sport. https://www.usada.org/spirit-of-sport/education/what-are-whereabouts-failures/. Had Defendants employed the same thoroughness and overall approach used to develop USADA's anti-doping policy to create a policy against the sexual abuse of minors that provided for disciplinary action, such as expulsion from the sport for athletes with a history as troubling as Gabel's, Plaintiff and other minors could have been protected.  Not only has official action not been taken against sexual predators operating under Defendants' auspices and authority, but there was a concerted effort as late as 2011 by the USOC executives to block even the publication of a handbook to counter the sexual abuse of athletes.  As noted above, Malia Arrington, then a USOC executive in charge of

abuse prevention, and Scott Blackmun, then chief executive of the USOC, affirmatively sought to prevent publication of the handbook, for fear that doing so would prompt athletes, who had been sexually abused, to come forward to report the abuse, with consequences of liability for the Olympic Defendants and institutions.

81.     By deliberately attempting to block publication of a handbook regarding sexual abuse prevention, the Olympic Defendants affirmatively chose to place the economic and reputational interests of the USOC, the USOEC, USS, and the SWC above the protection of young athletes from sexual abuse.

82.     Before publicly disclosing the sexual abuse she suffered, Bridie Farrell called Mike English, then the USOC's Chief of Sport Performance, to inform him that she was going to publicly announce her story. English connected Plaintiff with Blackmun, then the USOC CEO, who called Plaintiff as she was walking into a radio studio to publicly record her disclosure. Blackmun told Plaintiff that she was doing the "right thing."

83.     In February 2013, Bridie Farrell publicly revealed for the first time that Gabel had sexually molested her when she was 15 years old and he was 33. In response, in March 2013, Gabel made a stunning admission to the Chicago Tribune. Gabel confirmed that "[a]lmost two decades ago I displayed poor judgment in a brief, inappropriate relationship with a female teammate. . . . I know what happened was wrong, and I make no excuses for my behavior."

84.     Subsequent to Plaintiff's disclosure, Jane Doe #3 publicly accused Gabel of raping her as a minor, soon after she joined the Olympic training program in the summer of 1991. Jane Doe #3 participated in the 1992 and 1994 Winter Olympics and won a medal in each of these international competitions. Jane Doe #3 stated that Defendant Gabel had raped her at the USOEC

in Marquette, Michigan while she was a minor. Jane Doe #3 called Defendant Gabel "a child molester.....rapist...sexual abuser [and] pedophile."

85.     In March 2013, in response to these public revelations, USS publicly announced its investigation of sexual misconduct charges against Gabel, to be conducted by Sidley & Austin LLP. However, despite its public announcement of an investigation, USS declined and continues to decline to make public its investigative report into Gabel, including the investigation of the 1989 and 1990 incidents in Italy and at the USOEC in Michigan. To be sure, the depth, or lack of depth, of the investigation speaks volumes about the protective inner workings of Olympic Defendants. However, similar to the full facts surrounding Defendant the USOC's decision in 2011 to block publication of a sexual abuse prevention handbook, the results of the Gabel investigation remain secret, shielded from public release and shrouded from scrutiny by Defendant USS.

86.     In early March 2013, Defendant Gabel voluntarily resigned from the ISU. In 2015, Gabel forfeited his USS membership. To date, USS has not taken any formal action against Gabel, despite his own unequivocal admission that he had an improper abusive relationship with Plaintiff, at the time a 15-year-old minor.

87.     In the summer of 2013, Plaintiff met with the USOC CEO, Scott Blackmun, and the USOC's Director of Ethics and Safe Sport, Malia Arrington. Blackmun's response to Bridie Farrell, after she shared her story, was to chuckle, look down, and say, "Oh Gabes." Plaintiff requested that USS ban Gabel entirely from participation in official speedskating events and activities. Blackmun replied to Plaintiff that the USOC did not have the power or authority to ban Gabel.

88.     Blackmun subsequently resigned from the USOC in February 2018, purportedly as a result of ongoing health issues, according to a statement issued by Defendant the USOC. In its

30

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 31 of 40

2018 report, the Committee to Restore Integrity to the USOC identified Blackmun and the USOC as "creat[ing] the underlying conditions for sexual abuse to thrive by cutting athletes off from institutional support."

89.     By reason of the wrongful and neglectful acts of Defendants the USOC, the USOEC, USS, and the SWC, and their agents and employees, Bridie Farrell sustained psychological injuries, including but not limited to, severe physical, emotional, and psychological distress, humiliation, fright, dissociation, anger, depression, anxiety, family turmoil, hopelessness, mental anguish, and emotional and psychological damage.  Plaintiff has been informed and believes that some or all of the injuries she has suffered are of a continuing and lasting nature, with the result that Plaintiff will continue to bear the pain and costs of their enormous emotional burden and has and will be obligated to expend further substantial sums of money for continued treatment.

## VI.     CAUSES OF ACTION

### A.     FIRST CAUSE OF ACTION – NEGLIGENCE (CORPORATE DEFENDANTS)

90.     Plaintiff Bridie Farrell repeats and re-alleges here all of her allegations above and below.

91.     Defendants the USOC, the USOEC, USS, and the SWC had a duty to take reasonable steps to protect Bridie Farrell, a minor, from foreseeable harm when she was present at their premises and/or under their supervision and in their care, custody, and control.

92.     Defendants the USOC, the USOEC, USS, and the SWC also had a duty to take reasonable steps to prevent Gabel from employing the tasks, premises, status, and instrumentalities of his position as an athlete representative with USS to target, groom, and sexually abuse young girls, including Plaintiff.

31

93.     Defendant USS had a duty to Plaintiff, as a dues paying member, to ensure that training and events sanctioned by it were safe for the participation of Plaintiff and other minors participating in these programs.

94.     The SWC, through its employees and volunteers, also had a duty to prevent Gabel from having access to young impressionable members, when they were entrusted to its care, supervision, custody, and control.

95.     Defendant the SWC had supervisory responsibility over Plaintiff, as well as care and custody of Plaintiff, as a paying member of the club who participated in training provided by and arranged by the club, including trips during which Defendant the SWC, through its agents, had a duty to take reasonable steps to protect Plaintiff.

96.     These circumstances created a special relationship between Defendants the USOC, the USOEC, USS, the SWC, and Plaintiff that imposed upon each of those Defendants a duty to exercise the degree of care of a parent of ordinary prudence would exercise on behalf of its child in comparable circumstances.

97.     The USOC, the USOEC, USS, and the SWC breached each of the foregoing duties by failing to exercise reasonable care to prevent Gabel from harming Plaintiff, including sexually and emotionally abusing her.

98.     In breaching their duties, including giving Gabel access to children, entrusting their tasks, premises, status, and instrumentalities to him, failing to train their volunteers how to remain alert to the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn Plaintiff, her parents, or other parents of the danger of sexual abuse, and failing to create a safe and secure environment for Plaintiff and other young girls who were likely to interact

with Gabel, Defendants the USOC, the USOEC, USS, and the SWC created a substantial risk that Plaintiff would be sexually molested by Gabel.

99.     Defendants the USOC, the USOEC, USS, and the SWC, through their actions and inactions, created an environment that placed Plaintiff in danger of unreasonable risks of harm under the circumstances.

100.    It was reasonably foreseeable that Defendants' breach of their duties of care would result in the sexual abuse of young Bridie Farrell and other minors entrusted to the Defendants' care and who were present at events the Defendants organized and sanctioned.

101.    As a direct and proximate result of the acts and omissions of Defendants the USOC, the USOEC, USS, and the SWC, Gabel groomed and sexually abused Plaintiff, which has caused Plaintiff to suffer general and special damages in an amount to be determined at trial.

**B.      SECOND CAUSE OF ACTION – ASSAULT AND BATTERY
(DEFENDANT GABEL)**

102.    Plaintiff re-alleges all prior allegations.

103.    Defendant Gabel assaulted and battered Plaintiff by making offensive and physical harmful contact with Plaintiff's body through physical touching.

104.    Defendant Gabel's conduct was intentional and was designed to induce fear and assert control over Plaintiff, who was a 15-year-old minor.

105.    As a direct result of Defendant Gabel's actions, Plaintiff suffered and continues to suffer physical, emotional, and psychological injuries.

106.    Defendant Gabel's actions were intentional, reckless, grossly negligent, willful, wanton, and done with actual malice and disregard for Plaintiff's well-being.

107.    As a result of Defendant Gabel's intentional acts, Plaintiff is entitled to receive a substantial award of damages in an amount to be established at trial.

### C.      THIRD CAUSE OF ACTION - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

108.     Plaintiff Bridie Farrell repeats and re-alleges here all of her allegations above and below.

109.     Defendants the USOC, the USOEC, USS, and the SWC engaged in reckless conduct by introducing and providing Gabel with access to young girls, including Bridie Farrell, despite knowing that he would likely use his position to groom and sexually abuse them.  The misconduct by the Defendants is so shocking and outrageous that it exceeds the reasonable bounds of decency, as measured by what the average member of the community would tolerate, and demonstrates an utter disregard by these Defendants of the consequences that would naturally follow from their conduct.

110.     Defendants the USOC, the USOEC, USS, and the SWC had a duty to take reasonable steps to protect Bridie Farrell, a minor, from foreseeable harm when she was present on their premises and/or under their supervision and in their care, custody, and control.

111.     Defendants' reckless conduct resulted in permitting Gabel to use his position and influence with the Defendants to gain access to and to sexually abuse the Plaintiff.

112.     The USOC, the USOEC, USS, and the SWC knew or had reason to know that their reckless conduct would inflict severe emotional and psychological distress, including personal physical injury, on others.  Plaintiff has in fact suffered and continues to suffer from severe emotional and psychological distress and personal physical injury, including mental anguish, humiliation, and emotional and physical distress, for which she has and will continue to expend her own financial resources to address, as a result of Defendants' reckless conduct.

### D.   FOURTH CAUSE OF ACTION - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

113.    Plaintiff Bridie Farrell repeats and re-alleges here all of her allegations above and below.

114.    Defendants the USOC, the USOEC, USS, and the SWC engaged in reckless, extreme, and outrageous conduct by introducing and providing Gabel with access to young girls, including Bridie Farrell, despite knowing that Gabel would likely use his position to groom and sexually abuse them.  The misconduct by the Defendants is so shocking and outrageous that it exceeds the reasonable bounds of decency, as measured by what the average member of the community would tolerate, and demonstrates an utter disregard by these Defendants and of the consequences that would naturally follow from their conduct.

115.    The USOC, the USOEC, USS, and the SWC engaged in reckless, extreme, and outrageous conduct by, respectively, permitting Gabel to hold himself out as a representative of USS' governing board and by introducing young aspiring speedskaters to Gabel, and thus representing that Gabel was safe and trustworthy, despite the fact that these Defendants knew, or reasonably should have known, that Gabel was using his position to groom and sexually abuse young girls.  The Defendants' misconduct is so shocking and outrageous that it exceeds the reasonable bounds of decency, as measured by what the average member of the community would tolerate, and displays an utter disregard by them of the consequences that would follow.

116.    As a result of this reckless, extreme, and outrageous conduct, Gabel used his position and influence with the Defendants to gain access to and sexually abuse Bridie Farrell.

117.    The USOC, the USOEC, USS, and the SWC knew, or reasonably should have known, given the circumstances, that this reckless, extreme and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on others.

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 36 of 40

Plaintiff has in fact suffered and continues to suffer from severe emotional and psychological distress and personal physical injury, including mental anguish, humiliation, and emotional and physical distress, for which she has and will continue to expend her own financial resources to address, as a result of Defendants' reckless conduct.

## VII.    PRAYER FOR RELIEF

118.    The Plaintiff demands judgment against the Defendants named in her causes of action, together with compensatory and punitive damages to be determined in an amount at trial according to proof, and the interest, cost and disbursements pursuant to these causes of action, and such other and further relief as the Court deems just and proper.

119.    The Plaintiff expressly reserves the right to pursue additional causes of action, other than those outlined above, that are supported by the facts pleaded or that may be supported by other facts learned in discovery.

Dated: July 30, 2020

**BARNES & THORNBURG LLP**

By: _Michael G Battle_

MICHAEL A. BATTLE (1885128)
mbattle@btlaw.com
MICHELLE BRADFORD (4003042)
mbradford@btlaw.com
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006-4623
Telephone: (202) 408-6922
Facsimile: Fax: (202) 289-1330

CHARLES G. LA BELLA (1044155)
charles.labella@btlaw.com
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 321-5000
Facsimile: (619) 284-3894

*Attorneys for Plaintiff, Brigid Farrell*

36

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 37 of 40

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SARATOGA**

---

BRIGID ("BRIDIE") FARRELL, an individual

                              Plaintiff,

-against-

THE UNITED STATES OLYMPIC &
PARALYMPIC COMMITTEE, a Business Entity
of Form Unknown; US SPEEDSKATING, a
Business Entity of Form Unknown; THE UNITED
STATES OLYMPIC EDUCATION CENTER, a
Business Entity of Form Unknown, THE
SARATOGA WINTER CLUB, a Business Entity of
Form Unknown; and ANDREW ("ANDY")
GABEL, an individual.

                              Defendants.

---

Index No.: _____

Date Filed: _____

**ATTORNEY**
**VERIFICATION**

---

MICHAEL A. BATTLE, ESQ., an attorney duly admitted to practice in the Courts of New York State, and of the firm BARNES & THORNBURG, LLP., attorneys for the Plaintiff in the within action, hereby affirms under penalty of perjury:

That he has read within complaint and knows the contents thereof, and that the same is true to his own knowledge, except as to the matters therein states to be alleged upon information and belief, and that as to those matters he believes it to be true.

That the sources of his information and knowledge are investigations and records in the file.

That the reason this verification is made by Plaintiff's attorney and not by the Plaintiff is that the Plaintiff is not within the Court where the attorney has his office.

**[SIGNATURE ON FOLLOWING PAGE]**

37

Case 1:20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 38 of 40

Dated: July 30, 2020

MICHAEL A. BATTLE, ESQ.

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

SUPREME _____ COURT, COUNTY OF SARATOGA _____

Index No: _____    Date Index Issued: _____

| | For Court Use Only: |
|---|---|

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

IAS Entry Date _____

BRIGID ("BRIDIE") FARRELL, an individual

Plaintiff(s)/Petitioner(s)

Judge Assigned _____

-against-
THE UNITED STATES OLYMPIC & PARALYMPIC COMMITTEE, a Business Entity of Form Unknown; US SPEEDSKATING, a Business Entity of Form Unknown; THE UNITED STATES OLYMPIC EDUCATION CENTER, a Business Entity of Form Unknown, THE SARATOGA WINTER CLUB, a Business Entity of Form Unknown; and ANDREW ("ANDY") GABEL, an individual.

RJI Filed Date _____

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING**    Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ○ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (specify): _____
*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY**    Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):    ○ Residential    ○ Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ○ Tax Certiorari
- ○ Tax Foreclosure
- ○ Other Real Property (specify): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution    [see *NOTE* in COMMERCIAL section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (specify): _____

**MATRIMONIAL**
- ○ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M). For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**TORTS**
- ○ Asbestos
- ◉ Child Victims Act
- ○ Environmental (specify): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (specify): _____
- ○ Other Negligence (specify): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration) [see *NOTE* in COMMERCIAL section]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (specify): _____
- ○ Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ◉ | ○ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ○ | ○ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ○ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.
- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion    Relief Requested: _____    Return Date: _____
- ○ Notice of Petition    Relief Requested: _____    Return Date: _____
- ○ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Requested: _____
- ○ Poor Person Application
- ◉ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

FILED: SARATOGA COUNTY CLERK 07/30/2020 10:32 AM
NYSCEF DOC. NO.    Case 1.20-cv-01178-FJS-CFH   Document 2   Filed 09/24/20   Page 40 of 40

INDEX NO. EF20201723

RECEIVED NYSCEF: 07/30/2020

**RELATED CASES**    List any related actions.  For Matrimonial cases, list any related criminal or Family Court cases.  If none, leave blank.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**PARTIES**    For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email.  For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Brigid Farrell<br>Role(s): Plaintiff | Michael A. Battle, Barnes & Thornburg **LLP**, 1717 Pennsylvania Avenue NW, Suite 500, Washington, DC 20006, (202) 408-6922 | ○ YES   ○ NO |  |
| ☐ | Name: USOPC<br>Role(s): Defendant |  | ○ YES   ○ NO |  |
| ☐ | Name: US Speedskating<br>Role(s): Defendant |  | ○ YES   ○ NO |  |
| ☐ | Name: USOEC<br>Role(s): Defendant |  | ○ YES   ○ NO |  |
| ☐ | Name: Saratoga Winter Club<br>Role(s): Defendant |  | ○ YES   ○ NO |  |
| ☐ | Name: Andrew Gabel<br>Role(s): Defendant |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |
| ☐ | Name:<br>Role(s): |  | ○ YES   ○ NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:    July 30, 2020

_____
Signature

1885128
**Attorney Registration Number**

Michael A. Battle
**Print Name**