**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━

BRIGID "BRIDIE" FARRELL,

|  | Plaintiff, | 1:20-CV-01178 |
| v. | | (FJS/CFH) |

THE UNITED STATES OLYMPIC &
PARALYMIC COMMITTEE, et al.,

Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━

| **APPEARANCES:** | **OF COUNSEL:** |
| --- | --- |
| Barnes & Thornburg LLP<br>222 Delaware Avenue, Ste. 1200<br>Wilmington, DE 19801<br>    & | AMY E. TRYON, ESQ. |
| 665 West Broadway, Ste. 1300<br>San Diego, CA 92101<br>    & | CHARLES GERARD LA BELLA, ESQ. |
| 390 Madison Avenue, Ste. 12th Fl.<br>New York, New York 10017-2509<br>    & | JAMES F. MURDICA, ESQ. |
| 11 South Meridian St.<br>Indianapolis, IN 46204<br>Attorneys for plaintiff | ANNETTE ENGLAND, ESQ. |
| Covington & Burling LLP<br>1999 Avenue of the Stars<br>Ste. 3500<br>Los Angeles, CA 90067-4643<br>    & | MITCHELL AARON KAMIN, ESQ. |
| The New York Times Building<br>620 Eighth Avenue<br>New York, New York 10018<br>Attorneys for defendant The<br>United States Olympic &<br>Paraolympic Committee | SARA J. DENNIS, ESQ. |
| Coffey Law PLLC | DANIEL W. COFFEY, ESQ. |

17 Elk Street
Albany, New York 12207
Attorneys for defendant US Speedskating

Law Offices of Howard L. Jacobs          HOWARD JACOBS, ESQ.
31111 Agoura Rd., Ste 225
Westlake Village, CA 91361
Attorneys for defendant US Speedskating

Husch Blackwell                          AUSTIN DAVID O'MALLEY, ESQ.
115 Grand Street, Apt. 501
Hoboken, NJ 07030
Attorneys for defendant The Saratoga
Winter Club

Manning Gross & Massenburg LLP           KENNETH R. COSTA, ESQ.
One Citizen Plaza, Ste. 620
Providence, RI 02903
        &
200 Vesey Street, 25th Fl.               BERNADETTE WEAVER-CATALANA, ESQ.
New York, New York 10281
Attorneys for defendant The Saratoga
Winter Club

Aidala Bertuna & Kamins PC               IMRAN H. ANSARI, ESQ.
546 Fifth Avenue, Ste. 6th Fl.
New York, New York 10036
Attorneys for Andrew "Andy" Gabel

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION & ORDER

Presently pending before the Court is plaintiff Brigid "Bridie" Farrell's motion to compel. See Dkt. No. 116. Defendant US Speedskating (hereafter "USS") responded in opposition. See Dkt. No. 123. Plaintiff filed a reply. See Dkt. No. 135.

## I. **Relevant Background**[1]

This case arises from plaintiff's allegations that defendant Andrew Gabel – then her 33-year-old USS team member – sexually abused her, primarily in 1997, when she was fifteen years old.  See Dkt. No. 2 (hereafter "Compl.").  Plaintiff alleges that the abuse occurred "in connection with events and with travel to or from events and practices that were hosted, sponsored, sanctioned, supervised, and/or endorsed by" USS.  Compl. at 7.  As relevant here, plaintiff claims that USS knew of Gabel's prior sexual abuse or conduct toward other underage female speedskaters, but negligently failed to protect plaintiff from its occurrence.  See id.

Under the applicable law in New York State in 2013, plaintiff's ability "to seek redress through the court system" ended in 2005, as the statute of limitations expired when plaintiff turned twenty-three years old.  See Dkt. No. 116-1 at 6.  In 2020, plaintiff commenced this action in Saratoga County Supreme Court pursuant to the New York State Child Victims Act which "permits victims and survivors of childhood sexual abuse in the State of New York a one-year period in which to pursue otherwise time-barred claims."  Compl. at 6.  Defendants removed the case to the U.S. District Court, Northern District of New York.  See Dkt. No. 1.[2]

## II. **Arguments**

Plaintiff seeks the Court to compel USS to overturn its investigative file relating to Andy Gabel, including the investigation report that Sidley Austin, LLP completed

---

[1]  The Courts' citations to the parties' briefs and filings in connection with this motion reflect the pagination generated by the Court's electronic filing system, CM/ECF, located at the header of each page.
[2]  For a full statement of plaintiff's allegations and claims against US Speedskating and other defendants, reference is made to the complaint.  See Compl.

(hereafter "Sidley Report" or "Report").  See generally Dkt. No. 116-1.  More specifically, she seeks "interview summaries, engagement letter, and any documents collected during the investigation."  See generally id. at 7.  Plaintiff contends that the Sidley Report and related documents are not protected by the attorney-client privilege for several reasons.  First, plaintiff argues that USS cannot demonstrate that the investigation was conducted in anticipation of litigation.  She notes that "at the time USS hired Sidley Austin to investigate, the statute of limitations had already run on any criminal or civil claim with respect to plaintiff and to Jane Doe #3" and "New York State did not enact the 'look back statute' until several years after USS announced the investigation."[3]  Id. at 11.  Plaintiff contends that due to the statute of limitations issue, it is "unlikely that USS was anticipating any litigation as a result of Plaintiff or Jane Doe #3's public disclosure."  Id.  Instead, plaintiff provides that the USS has stated repeatedly that the purpose of the investigation was to determine whether USS had in place appropriate policies and procedures to ensure a "safe environment" for its members and to investigate plaintiff's and others' claims of abuse from Gabel.  See id. at 11-12, see also id. at 9-14.  Plaintiff points out that USS has not set forth "any other purpose for the Sidley investigation when it was commissioned by USS."  Id. at 11.  Plaintiff further argues that she has a substantial need for the Sidley Report because USS has stated that it was unaware of the "NMU allegations or the investigation until after the public disclosures made by Plaintiff and Jane Doe #3 in 2013."  Dkt. No. 116-1 at 15.

---

[3]  Jane Doe #3 is another former speedskater who alleged that Gabel sexually abused her when she was underage and that the abuse occurred before Gabel's abuse of plaintiff.  See Dkt. No. 16-1 at 8.

Plaintiff next argues that USS' privilege log is deficient.  <u>See</u> Dkt. No. 116-1 at 15-21.  Plaintiff contends that the log fails to "set forth specific facts with sufficient particularity for each document listed to establish attorney-client privilege[,]" instead setting forth "generic and nondescript" reasons for withholding documents.  <u>Id.</u> at 18.  Further, plaintiff argues that USS "has not met its burden of proof that the Report does not include any attorney impressions that are so interwoven in the report that the entire Report qualifies as privileged."  <u>Id.</u> at 18.  Plaintiff criticizes USS for failing to provide "affidavits or deposition testimony to further support its claim that the documents are privileged," which she contends is problematic due to the "deficiency" of the log entries. <u>Id.</u> at 19.  Next, plaintiff argues that the Sidley Report is not privileged merely due to its attachment to a privileged communication because the Report "is not independently privileged."  <u>Id.</u>

Plaintiff further asserts that USS did not demonstrate that the documents in the privilege log are protected attorney work product.  <u>See</u> Dkt. No. 116-1 at 19.  She contends that USS' statement that the Sidley Report and related documents are "'related to Plaintiff's March 2013 allegations'" does not explain "the circumstances under which it was prepared" such that the Court may determine that the primary purpose in creating the documents or communications was litigation.  <u>Id.</u> at 20.  Plaintiff additionally argues that because USS has not demonstrated that the Report was created in anticipation of litigation – rather than in the ordinary course of business or "'even if no litigation had been contemplated or pending'" – it cannot be protected by the work product doctrine.  <u>Id.</u> at 21.

Lastly, plaintiff argues that, if the Court determines that the Sidley Report is protected attorney work product, plaintiff should still be permitted access to the Report because she has a substantial need.  See Dkt. No. 116-1 at 25.  Plaintiff states that the 1990 Northern Michigan University ("NMU") investigative report[4] she received reflects interviews from five witnesses, whereas the Sidley Report is based on interviews from twenty-eight witnesses, which, according to plaintiff, demonstrates that the "Sidley Report dramatically expanded the scope of the inquiry into Gabel's alleged abuse of young female skaters."  Id. at 25.  Plaintiff contends that the Sidley investigation included interviews with "several current and former USS and USOPC personnel, none of whom were apparently interviewed in the 1990 investigation."  Id. at 25-26.

Plaintiff argues that this additional information is both (1) "critical" because USS' "awareness of the 1990 inquiry, their knowledge of the allegations, or even the rumors of Gabel's predatory activities is directly related to the USOPC's and USS's knowledge and conduct in this matter"; and (2) "material and essential" to the discovery process as the Sidley "interview notes may obviate or compel the taking of additional discovery of USOPC and/or USS."  Id. at 26.  Plaintiff further expounds that she has a substantial need because the memory and availability of interviewees may be impacted because they were interviewed several years ago, in 2013.  See id.  Further, two witnesses interviewed in the Sidley Report are now deceased.  See id.

---

[4]  Plaintiff provides, "[t]he USOC entered into a series of contracts with NMU dating back to 1983 to establish the official United States Olympic Education and Training Center on the NMU campus," and recruited athletes who were as young as twelve years old.  Dkt. No. 116-1 at 9 n.5.  The minor athletes would "attend a local High School and resided in a dorm on the NMU campus alongside athletes who were attending college classes."  Id.

Lastly, plaintiff argues that USS waived any claim of privilege with respect to the Report by sharing it with third parties.  See Dkt. No. 116-1 at 27-28.  Plaintiff references a June 2014 e-mail between Ted Morris of USS and Malia Arrington of USOPC where Mr. Morris "says he has to ask Sidley for permission to share the report with W. Scott Lewis in connection with and for use in his (Lewis's) own 2015 report."  Dkt. No. 116-1 at 28.  Plaintiff then "assum[es]" that Mr. Morris obtained permission and provided either "the report itself or its contents or a summary" to Mr. Lewis, "an external third party . . . who had no capacity to give legal advice and was likely not linked to any attorney-client relationship . . . this would constitute a waiver."  Id.  Further, plaintiff suggests the possibility of a waiver because a USS Member Newsletter stated that the USS Board of Directors "'reviewed the matter extensively'" and "'would like to share some of this discussion with the USS Membership as [they] move[d] forward.'"  Id.

In opposition, USS argues first that the Sidley Report is protected by the attorney-client privilege.  See Dkt. No. 123 at 10.  USS asserts that it need not demonstrate that the only purpose of the investigation was for USS to obtain legal advice; rather, that it be one of the primary purposes, specifically  "to provide legal advice about possible legal exposure arising from Plaintiff's March 2013 allegations."  Id. at 11-12.  USS proffers that

> in camera review will confirm that Sidley provided legal conclusions regarding (1) Sidley's opinion regarding the validity of the sexual misconduct allegations made by Plaintiff and others against Defendant Gabel; (2) Sidley's opinion regarding USS' knowledge of Gabel's alleged sexual misconduct during the relevant time period; and lastly, (3) Sidley's opinion regarding whether USS had the proper procedures in place to ensure a safe environment for athletes moving forward.

Dkt. No. 124 at 12.  USS argues that these "legal opinions" from a law firm retained to assess "the validity of the sexual misconduct allegations against Mr. Gabel, as well as whether USS was aware or should have been aware of the sexual misconduct (and if so, when it was or should have been aware)" "are precisely the types of opinions that are and should be protected by attorney-client privilege as well as the attorney work product privilege."  Id. at 12-13.

USS next argues that the Sidley Report[5] is also protected by the work product doctrine.  See Dkt. No. 123 at 13.  USS rejects plaintiff's claim that the Sidley Report could not have been prepared "in anticipation of litigation" under the theory that litigation was not possible until the Child Victim's Act was passed in 2019.  See id. at 14. Instead, USS contends that in addition to civil and criminal trials, "litigation" encompasses "other adversarial proceedings, such as administrative hearings, arbitration, and grand jury proceedings."  Id.  USS states that when it retained Sidley Austin, "USS was in receipt of a number of Section 9 and Section 10 Complaints and USS member grievances – all of which constitute administrative proceedings and/or arbitration proceedings," and that at least one member grievance "specifically referenced Plaintiff's allegations against Gabel."  Id. at 15.  USS also points to "Plaintiff's April 2, 2014[,] email to Ted Morris and Mike Plant of USS, which tie her allegations a year earlier to the 'risk of a lawsuit.'"  Id.

Regarding earlier investigation reports involving complaints or grievances from other members against other USS coaches, USS contends that the investigation into

---

[5]  USS also argues that the "reports and materials gathered in relation to the Sidley Report are protected under the work product privilege" for the same reasons, noting that these other materials were also prepared in anticipation of litigation.  Dkt. No. 123 at 16.

Coach Wilma Boostra "was conducted by the AAC SafeSport Working Group, not by USS or an attorney retained by USS, as plaintiff claims." Dkt. No. 123 at 15. USS does not directly address the report involving Jae Su Chun, but mentions that another coach, Kwang Jae Lee, "[w]as expelled from membership by an order of the USS Appeals Panel on July 16, 2012[,] for a violation of the USS Code of Conduct, and later filed a member grievance on October 29, 2015, seeking immediate reinstatement in good standing." Id. at 15-16.

Next, USS rejects plaintiff's argument that she has a substantial need for the investigative file and Report. See Dkt. No. 123 at 15. USS suggests that the information plaintiff seeks is "readily available" to her to obtain directly from the witnesses, noting that it produced to plaintiff the Sidley Report's summary of her own interview and the identities of the 28 persons interviewed for the report and their last-known contact information. See id. at 17 (citing Hickman v. Taylor, 329 U.S. 495 (1947)). USS notes that "deposition and/or subpoenas seeking documents have either been carried out or served on 9 of the 28" interviews. Id. USS argues that (1) the possibility that the witnesses' memories may have faded since 2013, when they were interviewed in connection with the Report; and (2) the unavailability of two witnesses, is insufficient to show a substantial need. See id. at 18.

USS argues further that it has not waived the privilege with respect to the Sidley Report. See Dkt. No. 123 at 18. USS provides that W. Scott Lewis is an attorney that USS retained "on or about August 13, 2014[,] in relation to Eva Rodansky's member grievance" which referenced plaintiff's claims against Gabel. Id. at 19. USS contends that Mr. Lewis "considered statements" from plaintiff and Gabel but

was not "provided with a copy" of the Report.  Id.  USS further attaches a letter dated

September 5, 2015, from W. Scott Lewis to Scott DuBois stating that his

> opinion is limited to [his] review of the following document and recording, and is not based on a full investigation into the allegations: 1. A recorded statement provided to US Speedskating by Ms. Farrell outlining the alleged conduct by Mr. Gabel. 2. A letter sent by Mr. Gabel on May 27, 2014 to Mr. Blackmon and Mr. Plant.

Dkt. No. 124-4 at 2.

Thus, USS contends it did not waive the privilege in connection with Mr. Lewis'

retention.  See Dkt. No. 124-4 at 2.  As to plaintiff's arguments regarding the member

newsletter, USS argues that because it has not provided the USS Board of Directors

with the Sidley Report or "any of the related materials at any point in time," plaintiff's

allegations that it waived the privilege in connection with the Board of Directors lacks

merit.  Id. at 20.

On June 9, 2023, plaintiff submitted a letter for the Court's consideration which

contains an e-mail correspondence from Mike Plant, the former USS Board of Directors'

president.  See Dkt. No. 220, exh 1.  Plaintiff contends that the e-mail "appears to

impact whether or not the Sidley Report was shared with third parties."  Dkt. No. 200 at

1.  In response, USS argues that the e-mail does not "prove that the Sidley report was

shared with third parties – specifically [W.] Scott Lewis" and that subsequent documents

. . . disprove this assertion."  Dkt. No. 203.  USS directs the Court to W. Scott Lewis'

Sept 5, 2015, Report and privilege log entry 50.  Id. at 1.

In her reply, plaintiff argues that USS has failed to demonstrate that the

investigation was conducted due to "the prospect of litigation," arguing that USS' cited

caselaw is distinguishable.  See Dkt. No. 135 at 4.  Further, she contends that the "test"

in the Second Circuit is "whether a document was prepared <u>solely</u> 'because of' litigation or its anticipation."  <u>Id.</u> at 6 (quoting <u>Ramsey v. NYP Holdings, Inc.</u>, 00 CIV.3478(VM)(MHD), 2002 WL 1402055, at *5 (S.D.N.Y. June 27, 2002) (emphasis added)). "[S]hort of directing the production of the entire report," plaintiff agrees with USS insofar as she believes an in camera review of the portions of the report addressing "'legal conclusions or 'validity of allegations'" is appropriate.  Dkt. No. 135 at 5.  However, plaintiff contends that the witness statements do not need in camera review as "no tortured interpretation of the Attorney-Client or Work Product Privileges are the factual statement of witnesses somehow protected simply because they are contained in an investigative report that may, in isolated sections, discuss legal conclusions and the validity of allegations."  <u>Id.</u>

Plaintiff also argues that even if the engagement letter with Sidley Austin establishes that the investigation was not solely to assess whether USS had the appropriate policies and procedures to ensure the safety of its members, the "engagement letter is not dispositive" because "USS likely purposefully inserted this purpose in the engagement letter to preserve an attempt to later cloak the investigation with privilege when in truth and in fact the true purpose of the investigation was – as the defendant admitted to is [sic] members, its Board and the public – to determine if USS had the proper procedures and policies in place to prevent sexual misconduct moving forward."  Dkt. No. 135 at 7.

Next, plaintiff reiterates her argument that she has a substantial need for the Sidley Report.  <u>See</u> Dkt. No. 135 at 8.  She contends that "at least two" of the interviewees are now deceased; one of the "possible Jane Does" cannot be located;

and David Lubs, "potentially a vital witness, is not mentally competent to testify."  Id.
Plaintiff contends that for these four witnesses, there is no means for plaintiff to obtain
substantially similar testimony. See id.

Finally, plaintiff argues, as to all witnesses, because "the circumstances in
question occurred over twenty years ago[, e]ven if the witnesses can be reached, the
same or substantially similar information is unlikely to surface during the course of
depositions or interviews."  Dkt. No. 135 at 8.  Plaintiff avers that the passage of time
has impacted those depositions already held, insofar as the witnesses "have
demonstrated time and time again the impact of the passage of time."  Id.   Further,
plaintiff proposes the possibility that witnesses who were interviewed in 2013 may now
be "less forthcoming given the currently [sic] lawsuit and the related publicity."  Id. at 9.

Finally, plaintiff argues that USS's argument that Mr. Lewis or the Board were
never given a copy of the Sidley Report does not ameliorate waiver concerns because
"USS does not refute that the contents or information from the report was shared."  Dkt.
No. 135 at 9-10.  Plaintiff contends that privilege is waived "if the substance and
conclusions of the Sidley Report were discussed with the Board, and the Board
subsequently discussed the substance of the Sidley Report with USS membership[,]"
which "the Board made clear its intention to do[.]"  Id. at 10.

### III.  **Legal Standards**

### A.  **Attorney-Client Privilege**

This Court has held:

The attorney-client privilege "enable[s] attorneys to give informed legal
advice to clients" and "protects communications between a client and its
attorney that are intended to be, and in fact were, kept confidential."

Schaeffler v. United States, 806 F.3d 34, 40 (2d Cir. 2015). This Court has held that communications are deemed confidential if:

> (1) . . . legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived.

Trudeau v. New York State Consumer Protection Bd., 237 F.R.D. 325, 335-36 (N.D.N.Y. 2006) (citing United States v. Int'l Bd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997)) and (In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1036 (2d Cir. 1984)); see also Mejia, 655 F.3d at 132. The privilege protects the attorney's advice to the client and the information communicated by the client that provides a basis for giving advice. See Upjohn Co., 449 U.S. at 390, 101 S.Ct. 677; In re Six Grand Jury Witnesses, 979 F.2d 939, 943-44 (2d Cir. 1992); Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 547, 554 (S.D.N.Y. 2013). "But since the privilege stands in derogation of the public's right to every man's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000). The burden of proving the existence of the privilege rests with the party asserting the privilege. See Mejia, 655 F.3d at 132; In re Grand Jury Subpoena Dated July 6, 2005, 256 F. App'x 379, 382 (2d Cir. 2007) (summary order). Thus, "[t]he party asserting the privilege must establish the essential elements of the privilege." United States v. Constr. Prod. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996) (citations omitted). "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege." Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (citing Scholtisek v. Eldre Corp., 441 F. Supp. 2d 459, 462 (W.D.N.Y. 2006) (additional citations omitted)).

Nat'l Rifle Ass'n of Am. v. Cuomo, 332 F.R.D. 420, 437 (N.D.N.Y. 2019).

"Blanket claims asserting the attorney client privilege are improper" and must instead "be determined on a case[-]by[-]case analysis of the relevant factors not upon a blanket assertion of the privilege." Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.), 139 F.R.D. 295, 300 (S.D.N.Y. 1991) (additional citation omitted). "Further, the privilege does not protect facts obtained by an

attorney from independent sources which were thereafter conveyed to the client."
Id. (citing Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc., 111
F.R.D. 76, 80 (S.D.N.Y. 1986)); see also In re Grand Jury Subpoenas Dated Oct.
22, 1991, and Nov. 1, 1991, 959 F.2d 1158, 1165 (2d Cir. 1992) (noting the
difference between information-based and communication-based privileges); In
re Wagar, Civ. No. 1:06-MC-127 (LEK/RFT) 2006 WL 3699544, at *15 (N.D.N.Y.
Dec. 13, 2006) (citing In re Grand Jury Subpoena dated Mar. 19 & Aug. 2, 2022,
282 F.3d 156, 161 (2d Cir. 2002) ("The same principles are true with regard to
the work product doctrine because work product may encompass facts as well.").

"The attorney-client privilege is generally waived 'by voluntary disclosure of the
[privileged] communication to another party.'"  Loguidice v. McTiernan, No. 1:14-CV-
1323 (TJM/CFH), 2018 WL 4011584, at *5 (N.D.N.Y. Aug. 22, 2018) (quoting Schaeffler
v. United States, 806 F.3d 34, 40 (2d Cir. 2015)).[6] "'The party invoking the privilege also
has the burden to show that the privilege has not been waived.'"  In re Signet Jewelers
Ltd. Sec. Litig., 332 F.R.D. 131, 134-35 (S.D.N.Y. 2019), aff'd, No. 16CIV6728CMSDA,
2019 WL 5558081 (S.D.N.Y. Oct. 23, 2019) (quoting Wultz v. Bank of China Ltd., 304
F.R.D. 384, 391 (S.D.N.Y. 2015) (citation omitted) and citing Egiazaryan v. Zalmayev,
290 F.R.D. 421, 428 (S.D.N.Y. 2013)).

## B. Attorney Work Product Doctrine

---

[6] "The analysis remains the same for waiver of attorney-client privilege and attorney work product
privilege." Loguidice v. McTiernan, No. 1:14-CV-1323 (TJM/CFH), 2018 WL 4011584, at *6 (N.D.N.Y.
Aug. 22, 2018) (citing Local 851 of Intern. Bros. of Teamsters v. Kuehne & Nagel Air Freight, Inc., 36
F.Supp. 2d 127, n.3 (E.D.N.Y. 1998) ("[W]hen disclosure is made to an adversary . . . the analysis is the
same for both the attorney-client privilege and work product immunity.") (additional citation omitted)).

The attorney work product doctrine "shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need." United States v. Adlman, 68 F.3d 1495, 1501 (2d Cir. 1995) (quoting FED. R. CIV. P. 26(b)(3)); accord Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, 171 F. Supp. 3d 136, 141 (S.D.N.Y. 2016). Although a document "'need not be prepared primarily or exclusively to assist at trial in order to be prepared 'in anticipation of litigation . . . . , more than a remote possibility of litigation must be shown." United States ex rel. Rubar v. Hayner Hoyt Corp., No. 5:14-CV-830 (GLS/CFH), 2018 WL 5811427, at *3 (N.D.N.Y. Nov. 5, 2018) (internal citations and quotation marks omitted).

> There are two types of work product, ordinary or fact (herein "fact") and opinion.  [F]act work product may encompass factual material, including the result of a factual investigation. In contrast, opinion work product reveals the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative, and is entitled to greater protection than fact work product. To be entitled to protection for opinion work product, the party asserting the privilege must show a real, rather than speculative, concern that the work product will reveal counsel's thought processes in relation to pending or anticipated litigation.

In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d at 183-84 (internal citations and quotation marks omitted).

Opinion work product, consisting of "mental impressions, conclusions, opinions or legal theories . . . concerning the litigation," Upjohn, 449 U.S. at 400, is entitled to greater protection than factual material, In re Grand Jury Subpoena, 510 F.3d at 183, and must be protected "unless a highly persuasive showing [of need] is made," In re Grand Jury Proceedings, 219 F.3d 175, 190 (2d Cir. 2000) (quoting United States v. Adlman, 134 F.3d 1194, 1204 (2d Cir. 1998) (alteration in original)), as, for example,

when counsel's thought processes are central to the litigation, see Anilao v. Spota, No. 10 CV 32, 2015 WL 5793667, at *13 (E.D.N.Y. Sept. 30, 2015); Tribune Co. v. Purcigliotti, No. 93 Civ. 7222, 1998 WL 175933, at *4 (S.D.N.Y. Apr. 14, 1998). However, "the 'selection and compilation of . . . documents by counsel transforms that material into attorney work product" only if there is "a real, rather than speculative, concern that counsel's thought processes in relation to pending or anticipated litigation will be exposed through disclosure of the compiled documents.'" Walker, 243 F. App'x at 624 (quoting In re Grand Jury Subpoenas, 318 F.3d at 386) (internal quotation marks omitted).

The work product doctrine "must be narrowly construed and its application must be consistent with the purposes underlying the asserted immunity." Chen-Oster, 293 F.R.D. at 552; In re Grand Jury Subpoenas, 318 F.3d at 384 (same).

There is nothing in Rule 26 that requires

> "that documents be produced primarily or exclusively to assist in litigation in order to be protected [a]s [such a requirement is] at odds with the text and policies of the Rule. Nowhere does Rule 26(b)(3) state that a document must have been prepared primarily or exclusively to aid in litigation. Preparing a document 'in anticipation of litigation' is sufficient." In re Symbol Technologies, Inc. Securities Litig., CV 05-3923 (DRH/AKT), 2017 WL 1233842, at *8 (E.D.N.Y. Mar. 31, 2017).

United States ex rel. Rubar v. Hayner Hoyt Corp., No. 5:14-CV-830 (GLS/CFH), 2018 WL 5811427, at *4 (N.D.N.Y. Nov. 5, 2018).

> There is a distinction between materials protected by the attorney client privilege and those protected as materials prepared in anticipation of litigation. The attorney client privilege protects confidential disclosures by a client to his or her attorney which are made in order to obtain legal assistance; however, it protects the confidential communication of the information and not the information itself. In the Matter of Grand Jury Subpoenas Dated October 22, 1991 & November 1, 1991, 959 F.2d 1158, 1165 (2d Cir.1992), citing, United States v. Cunningham, 672 F.2d 1064,

1073 n. 8 (2d Cir.1982). On the other hand, material prepared in anticipation of litigation generally refers to the work product of the lawyer, his agents, and in some circumstances even third parties. Id., 959 F.2d at 1166.

McPheeters v. McGinn, Smith & Co., No. 91-CV-180, 1992 WL 398445, at *1 (N.D.N.Y. Dec. 21, 1992).  "The attorney-client privilege and the work product rule serve different objectives." Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 547, 553 (S.D.N.Y. 2013) (quoting Adlman, 134 F.3d at 1200 n.4)).  "The work product doctrine is distinct from and broader than the attorney-client privilege." United States v. Nobles, 422 U.S. 225, 238 n. 11 (1975) (citing Hickman v. Taylor, 329 U.S. 495, 508 (1947)); see generally Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 380, 581 N.E.2d 1055, 1061 (1991) ("The prospect of litigation may be relevant to the subject of work product and trial preparation materials, but the attorney-client privilege is not tied to the contemplation of litigation.  Legal advice is often sought, and rendered, precisely to avoid litigation, or facilitate compliance with the law, or simply to guide a client's course of conduct.") (internal citation omitted).


## IV.  Discussion

### A.  Attorney-Client Privilege

Plaintiff argues that the Sidley Report and investigative file are not protected by the attorney-client privilege because the investigation's purpose was not to provide legal advice, but to determine whether there were appropriate procedures and safeguards in place to protect USS members.[7]  USS argues that it need not show one purpose for the

---

[7]      Plaintiff has not fully distinguished her arguments for attorney-client privilege and attorney work product, instead arguing that neither privilege applies because the purpose of the Sidley Austin investigation was to determine whether there were appropriate policies and procedures in place.  She

investigation as long as one of the significant purposes was to provide legal advice, and that an in camera review demonstrates such a purpose.  However, although USS acknowledges that the primary purpose of the communication must to provide legal advice, USS addresses the privilege in a sweeping manner, arguing that because – in its opinion – a primary purpose of the investigation was to provide legal advice, the communications associated with the investigation are privileged.  However, attorney-client privilege cannot be assessed in this way.  It must be determined that each communication claimed to be privileged was intended to primarily provide legal advice – it is not enough to show that the law firm was engaged for providing legal advice or that the primary purpose of an investigation was to provide legal advice.  Plaintiff, at times, conflates the attorney-client privilege with attorney work product.

Caselaw in this Circuit shows that, for an internal investigation, anticipation of litigation need not be the "sole" or "predominant" reason behind a communication for the attorney-client privilege to attach.  As the Southern District of New York set forth:

> For the [attorney-client] privilege to attach, the "predominant purpose of the communication" must be "to render or solicit legal advice." In re Cty. of Erie, 473 F.3d at 420. In the context of an internal investigation, however, that test "does not require a showing that obtaining or providing legal advice was the sole purpose of [the] investigation" nor that the communications at issue "would not have been made 'but for' the fact that legal advice was sought." In re General Motors LLC Ignition Switch Litig., 80 F.Supp.3d 521, 530 (S.D.N.Y.2015) (emphasis in the original) (quoting In re Kellogg Brown & Root, Inc., 756 F.3d 754, 759 (D.C.Cir.2014)). As explained in General Motors
>
> > Rare is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes; indeed, the very prospect of legal action against a company necessarily implicates larger concerns about the company's internal procedures and controls, not to mention its bottom line.

> 80 F.Supp.3d at 530. The party invoking the attorney-client privilege, therefore, need only show that the provision of legal advice was a "primary purpose" of the investigation and of the communications as to which the privilege is claimed. Id.

United States v. Mount Sinai Hosp., 185 F. Supp. 3d 383, 389-90 (S.D.N.Y. 2016).

The Court, as reached below, concludes that USS has failed to demonstrate that the Sidley Report was prepared in anticipation of litigation.  However, that the USS has not demonstrated that the Report or related documents to be protected attorney work product does not mean those documents cannot be separately protected by the attorney-client privilege as the seeking and receiving of legal advice.

As the Court further concludes that the privilege log is not sufficiently detailed for the Court to assess the attorney-client privileged nature of the documents., it has undertaken an in camera review of the Sidley Report and related documents.  See Gunning v. New York State Just. Ctr. for Prot. of People With Special Needs, No. 1:19-CV-1446 (GLS/CFH), 2022 WL 783226, at *6 (N.D.N.Y. Mar. 15, 2022) ("Put another way, 'the log must provide[ ] information about the nature of the withheld documents sufficient to enable the receiving party to make an intelligent determination about the validity of the assertion of the privilege.'") (quoting Chevron Corp. v. Donziger, No. 11-CV-0691 (LAK/JCF), 2013 WL 4045326, at *2 (S.D.N.Y. Aug. 9, 2013) (internal citation omitted)).

It is not possible to isolate a singular purpose of the Sidley Report, as, to the extent it can be determined from the in camera submissions, there appears to be a mix of concerns: business and public relations, desire to seek legal advice/consult, and an intent to assess and implement protective and preventative measures.

After in camera review, the Court concludes that one of the primary purposes of the Sidley Austin investigation and report – albeit not the exclusive purpose – was to provide legal advice.  However, the Court's analysis does not end with that conclusion because not every document is necessarily for the purpose of providing or soliciting legal advice.  The Court must assess each document individually to determine whether the protections of the attorney-client privilege apply to each document.

Entry 2[8] is the Sidley Austin Report.  Plaintiff claims both the attorney-client and attorney work product privileges with respect to this report.  It appears that USS argues that entry 2 is protected by the attorney-client privilege because it reflects "legal advice regarding Plaintiff's March 2013 allegations."  See Priv. Log.  Entry 2 is labeled "Privileged and Confidential Attorney-Client Communication"; however, this label is not dispositive.  The Court concludes that the majority of entry 2 is not protected by the attorney-client privilege as it is transmitting factual information from third parties, not legal advice.  United States v. Walker, 243 F. App'x 621, 623 (2d Cir. 2007) (summary order) ("The attorney-client privilege protects from disclosure the contents of confidential attorney-client communications, but does not prevent disclosure from the client's records the underlying factual information included in attorney-client communications.") (citing Upjohn Co., 449 U.S. at 395).

As information that is available from another source, obtained by the attorney, is not protected by the attorney-client privilege, because pages 1-55[9] of entry 2 reflect

---

[8] Entry 1 was not included with in camera disclosure.  The privilege log indicates that counsel for USS had been unable to locate entry 1, which was an e-mail to which entry 2 was attached.

[9] For the Sidley Austin Report, the Court's reference to the page numbers is to the document's pagination, located on the bottom left corner of the page.

factual information from other sources, pages 1-55[10] are not protected.  There is no

"real" concern that the attorneys' "thought processes with respect to anticipated

litigation" will be revealed from disclosure or pages 1-55.  <u>Walker</u>, 243 F.App'x at 624.

The Court finds otherwise with respect to pages 56-65 of the Report,[11] and concludes

that these pages of the Report are protected by the attorney-client privilege as the

giving of legal advice and because this portion of the Report would reveal attorney

thought processes from the attorneys, acting in their legal capacities.  <u>See</u> <u>Zucker</u>, 2021

WL 6128429, at *4 (relying on <u>In re County of Erie</u> in holding that a portion of an e-mail

chain being privileged does not require the remainder of the chain to be privileged).

Accordingly, the conclusions section of entry 2, pages 56-65, is protected by the

attorney-client privilege to the extent that it is prepared by counsel to be discussed with

its client, USS, for purposes of providing legal advice.

Entries 4-5 are attorney-client privileged as it is an e-mail soliciting legal advice

on a public communication regarding the investigation.  As entries 4 and 5 involve the

solicitation and giving of legal advice, entries 4 and 5 are protected from disclosure.

Entries 6-7[12] are copies of the engagement letter between Sidley Austin and

USS.  The Court concludes that this engagement letter is not protected by the attorney-

client privilege.[13]  The only reason for which USS claimed privilege is that the

engagement letter is an "[a]ttorney-client communication regarding engagement of legal

services."  <u>See</u> Priv. Log.  The engagement letter does not involve the giving or

---

[10] Bates Stamped pages USS00206-USS00261.
[11] Bates Stamped pages 00261-00270.
[12] Entry 7 is nearly identical to entry 6.  The only differences that the Court could discern: the inclusion of a fax cover sheet, the person to whom the letter was addressed was changed, and there was a correction of a misspelling.  The Court does not find, nor does defendant specify, that these alterations would amount to an attorney-client privileged communication.
[13]  USS did not claim any work product protection with respect to entry 6.  <u>See</u> Privilege Log.

receiving of legal advice, nor does it reveal any legal strategies.  However, even if the

Court had concluded that the engagement letter is protected by the attorney-client to the

extent, such privilege would be waived because USS revealed the substance of the

scope of their representation and the intention behind the investigation, reflected within

the engagement letter, in its opposition briefing by including the legal conclusions that

Sidley Austin was to provide as part of its representation.  See In re Grand Jury

proceedings, 219 F.3d 175, 182 (2d Cir. 2000) (noting that "a party cannot partially

disclose privileged communications or affirmatively rely on privileged communications to

support its claim or defense and then shield the underlying communications from

scrutiny."); Dkt. No. 123 at 12.  The remainder of the engagement letter appears to be a

boilerplate document and merely sets forth the terms of the representation.  It does not

reveal any strategies or otherwise unknown details about the nature of services

provided.  See United States ex rel. Rubar v. Hayner Hoyt Corp., No. 5:14-CV-830

(GLS/CFH), 2018 WL 5811427, at *9 (N.D.N.Y. Nov. 5, 2018) (quoting Newmarkets

Partners, LLC v., 258 F.R.D. at 101 ("The final engagement letter sets forth Dannible's

fees, payment structure, the general extent of the services Dannible was to perform,

and boilerplate language about how Dannible and Lynn Law Firm would address

disputes regarding payment. The final engagement letter is not privileged.

Defendants/Dannible fail to set forth any argument explaining why the draft letter

contains privileged information, such as whether the draft letter would contain

'undisclosed motive, strategy, or the nature of the services provided' beyond what is

included in the disclosed final engagement letter.'").  "Indeed, '[i]n general, the 'fact of

retainer [and] identity of the client' are not privileged, because they do not qualify as

'confidential communications' made for the purpose of securing legal advice.'" <u>Hayner Hoyt Corp.</u>, 2018 WL 5811427, at *9 (quoting <u>Newmarkets Partners, LLC v. Sal Oppenheim Jr. & Cie. S.C.A.</u>, 258 F.R.D. 95, 101 (S.D.N.Y. 2009)).  Accordingly, USS has failed to meet its burden of demonstrating that entries 6 or 7 are attorney-client privileged.

Entry 36 is an e-mail from Frank Favia, Jr., an attorney with Sidley Austin, to Tamara Castellano of USS and Ellen S. Robbins, also an attorney with Sidley Austin.  It seeks contact information for individuals that Mr. Favia sought to interview.  This e-mail is protected by the attorney-client privilege.  Although it is administrative in nature, in that it seeks contact information from USS, because it seeks information from the client in connection with the provision of legal advice, and to reveal this e-mail would provide insight into that process[14] insofar it could reveal the attorney's strategy, it is protected by attorney-client privilege.

Entry 38 appears to be an e-mail summarizing a teleconference between members of Sidley Austin and high-ranking officials from USS.[15]  Entry 38 reflects information gathering and communications between attorney and client for the purpose of facilitating the giving of legal advice.  It also reflects, in a lesser sense, legal strategy insofar as it notes certain relevant documents Sidley Austin needed to obtain from USS in its investigation.  Accordingly, entry 38 is a protected by the attorney-client privilege.

---

[14]  Whether portions of this information may be overturned in connection with this Court's ruling on other privilege log entries is not a consideration in reviewing entry 36.

[15]  Entry 38 is a repeat of entry 37 with the difference being that a portion of entry 38 is redacted.  It is not fully clear to the Court why attorney-client privilege is claimed for entry 38 and not entry 37 as entry 38 lacks the e-mail communication contained in entry 37.

Entry 39 is an e-mail between Tamara Castellano, Frank Favia, Jr., and Ellen S. Robbins. It relates to the gathering of contact information of people Sidley Austin sought to interview. For the reasons set forth in the Court's discussion of entry 36, entry 39 is protected by the attorney-client privilege.

Entries 40-43 are e-mails from an e-mail chain between USS Counsel Scott A. DuBois, Esq., Ellen S. Robbins, Frank Favia, Jr. USS has claimed attorney-client privilege and attorney work product for entries 40 and 42 and attorney-client privilege only for entries 41 and 42. Entries 40-42 are not protected by the attorney-client privilege. These e-mails are entirely administrative in nature – seeking a mutually-agreeable time to schedule a phone call to discuss questions regarding the investigation. Although the client indicates having questions to ask of the attorneys, the e-mails do not include any of the questions or reveal any legal advice or strategy. The only information revealed is the parties' availability in their schedules. The mere mention of a desire to speak about the subject of the representation, without more, does not render the e-mails attorney-client privileged.

Entries 43-54 are various portions of an e-mail chain. USS has not demonstrated that entries 43-54 are protected by the attorney-client privilege. These e-mails are part of an e-mail communication between Ellen Robins, Scott Dubois, Ted Morris, and Frank Favia, Jr. Similar to entries 40-42, entries 43-54 involves scheduling and exchanging of documents, specifically interview summaries and the scheduling of a meeting. Although there includes an inquiry about the available formats of the interview summaries, nothing about this question or the answer involves the giving or receiving of legal advice or information that facilitates the giving or receiving of legal advice. The

emails themselves do not reveal any privileged information about the content of the attachments.  That the e-mails contain notices indicating that they are attorney-client privileged communications does not render them so.  These e-mails are administrative and logistic in nature and do not involve legal strategy.  Although entry 43 asks a more specific question about plaintiff's interview, it is similarly of an administrative, practical nature and does not reveal any privileged information.  Accordingly, USS fails to demonstrate that entries 43-54 are protected by the attorney-client privilege.

Entries 55-58 are e-mail communications between USS' Ted Morris, Ellen Robins, Scott DuBois, and Frank Favia, Jr.  These e-mails, all within the same e-mail chain, involve the solicitation and receipt of legal advice and are protected by the attorney-client privilege.

Entries 59 and 60 are an e-mail chain between Ellen Robbins and Ted Morris wherein Ms. Robbins is seeking contact information for people she may wish to interview and various documents.  For the reasons stated when reviewing entry 36, this information is protected by the attorney-client privilege.

Entry 61 is an email chain containing an email from Frank Favia, Jr. to Ted Morris, and a response from Ted Morris to Frank Favia, Jr., with Scott A. Dubois and Frank Favia, Jr. carbon-copied on the e-mail.  This e-mail does not involve the solicitation or receipt of legal advice but conveys factual information.  See ECDC Environmental v. New York Marine and General Ins. Co., No. 96CIV.6033 (BSJ/HBP), 1998 WL 614478, at *9-10 (S.D.N.Y. June 4, 1998) (noting that the communication of facts an attorney learns from other sources and then conveys to the client is not protected as a privileged communication absent the inclusion of legal analysis).

Further, as the subject of the e-mail chain is a communication from plaintiff's counsel, it does not involve any information about which plaintiff would be unaware and does not reveal client confidences.  "Further, the privilege does not protect facts obtained by an attorney from independent sources which were thereafter conveyed to the client."  Id. (citing Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc., 111 F.R.D. 76, 80 (S.D.N.Y. 1986)).  Accordingly, entry 61 is not protected by the attorney-client privilege.

Entry 62 is a repeat of portions of the same e-mail chain from entry 42.  For the reasons set forth in review of entry 42, USS has not demonstrated that entry 62 is protected by the attorney-client privilege.

Entry 63 is an e-mail from Ted Morris to Ellen Robins, Frank Favia, Jr, carbon-copied to Scott A. Dubois, and a forward of that e-mail from Ellen Robbins to various people who appear to be from Sidley Austin.  The e-mail communicates USS' impressions of Sidley Austin's representation.  Accordingly, it is protected by the attorney-client privilege.

Entry 64 is an e-mail from Tamara Castellano to Ellen Robbins. The information conveyed is authored by USS and does not appear to have had any input from Sidley Austin.  The e-mail does not seek legal advice on the contents of the e-mail, but is sent to keep the attorney informed.  Although the e-mail contains commentary regarding word choice, there is no indication that this commentary came from Sidley Austin or other counsel or that it legal in nature. The e-mail does not involve plaintiff's allegations against Gabel or the matters for which Sidley Austin was retained. USS has failed to demonstrate that entry 64 is protected by the attorney-client privilege.

Entry 65 is an e-mail that appears to be authored by Tamara Castellano which was forwarded by Ellen Robbins to other attorneys from Sidley Austin and members of USS Board of Directors.  This e-mail communicates information from a publicly-available source. It is merely factual in nature. It does not reveal legal advice, strategy, or privileged communications.  Accordingly, entry 65 is not protected by the attorney-client privilege.

Entry 66 is an e-mail that appears to be authored by Tamara Castellano which she sent to some members of the USS Board of Directors and which was then sent from Ellen Robbins to various attorneys at Sidley Austin.  Entry 67 is a repeat of entry 66 with a small portion redacted.  The privilege log demonstrates that entry 67 was an attachment to entry 66. To the Court's understanding, the content of the e-mail was not authored by any attorneys, but by Tamara Castellano.[16]  Although the contents of the e-mail appear to be drafted by USS and without attorney input – and USS has not demonstrated otherwise – entry 66 does seek the attorneys at Sidley Austin to provide any changes, commentary, or feedback on the contents of the e-mail.  Entry 67 does not include the language soliciting attorney feedback or advice; however, it is attached to entry 66, identical in all other aspects to entry 67, and it is clear that the intent of the attachment entry 67 to entry 66 was for solicitation of legal advice.  Accordingly, entries 66 and 67 involve the solicitation of legal advice and amount to attorney-client privileged communications that are protected from disclosure.

---

[16] Although the privilege log lists the authors of entry 66 as Tamara Castellano and Ellen Robbins, it appears that the Ellen Robbins designation may refer only the inclusion of her e-mail that forwards along the original e-mail, without any additional text or commentary.

Entry 68 is an e-mail from Ellen Robbins to Ted Morris and Frank Favia, Jr., wherein Ms. Robbins is seeking factual information from Mr. Morris.  Entry 68 does not include the response to the requested information and does not provide any analytical input from Ms. Robbins.  The information Ms. Robbins is seeking is not confidential, neutral, and appears as if it would be publicly available.  Accordingly, USS has failed to prove that entry 68 is attorney-client privileged.

Entry 69 is an e-mail from Ellen Robbins to Ted Morris and Frank Favia, Jr., which provides a status update on the Sidley Report.  This communication does not convey any confidential information and does not provide legal advice.  Further, to the extent entry 69 references an earlier request for documents, it does not identify said documents.  To the extent USS might suggest entry 69 reveals legal strategy insofar as it references documents sought from USS and timing of completion of the investigation, it is plain from the four corners of the e-mail that the timing discussion is practical and not legal or strategical in nature.  Accordingly, entry 69 is not protected by the attorney-client privilege.

Entry 70 is an e-mail from Ellen Robbins to Ted Morris and Frank Favia, Jr. Entry 70 contains a list of people that Sidley Austin seeks contact information for and expresses a desire to interview.  For the reasons set forth in the Court's review of entry 36, entry 70 is protected by the attorney-client privilege.

Entry 71 is an internal e-mail from Carolyn Williams of Sidley Austin to Ellen Robbins and other attorneys from Sidley Austin.  The e-mail attaches various USS documents.  The body of the e-mail itself does not contain any information beyond indicating that documents are attached.  USS has failed to demonstrate that entry 71 is

protected by the attorney-client privilege.  It appears that the attachments in entry 71 are documents USS provided to Sidley Austin.  However, one of these attachments is the USS Bylaws.  USS fails to demonstrate why a copy of the USS Bylaws is entitled to any attorney-client privilege protection.  Transmission of an otherwise nonprivileged document to an attorney does not, alone, render that document privileged.  Thus, the portion of entry 71 that contains the Bylaws, absent any commentary or even context, does not amount to an attorney-client privileged communication.

USS has also failed to demonstrate that the White & Case final report, included as an attachment, is protected by the attorney-client privilege.  As plaintiff sets forth in her brief, USS released the White & Case report to the public, so any privilege it may claim with respect to the final White & Case report – either attorney-client privilege or attorney work product – is waived.   As for the remainder of the documents in entry 71, USS fails to meet its burden of demonstrating attorney-client privilege.  Although some of the documents, already discussed, are self-explanatory, USS fails to provide context for any of these documents, does not explain whether any of these documents were released to the public, identify the author of the documents, or indicate whether they are drafts or in their final form.  Accordingly, USS fails to demonstrate that the attorney-client privilege applies to the remainder of entry 71.

Entry 72 is an e-mail from a third-party company to Tamara Castellano that Ms. Castellano forwarded to Ellen Robbins, who then forwarded to Carolyn Williams and various attorneys at Sidley Austin.  USS fails to demonstrate attorney-client privilege. This e-mail contains several links and information that appears to be a roundup of media mentions of USS.  It appears that this roundup was collected and compiled by a

third-party company.  USS not only fails to demonstrate that articles and various public news reports are privileged, but fails to address how collection of this public information by a third-party entity, amounts to attorney-client privileged communication.

Although USS forwarded this information to Sidley Austin, this alone does not render it privileged.  First, the e-mail does not reveal any client confidences or legal advice.  Second, the e-mail is a collection of publicly-available resources, without any attorney input or confidential client commentary.  Third, even if there were somehow a privilege, USS fails to demonstrate why this privilege would not be waived by having a third-party entity compile this information.  Accordingly, USS has failed to demonstrate that entry 72 is protected by the attorney-client privilege.

Entry 73 is an e-mail chain from Mark Greenwald of USS to Ellen Robbins and Tamara Castellano and related responses.  The e-mail is administrative in nature and involves a discussion of receipt of Sidley Austin's engagement letter.  The e-mail does not discuss any legal strategy or involve any solicitation or receipt of legal advice. Accordingly, USS has failed to demonstrate that entry 73 is protected by the attorney-client privilege.

Entry 74[17] is a repeat of portions of entry 63.  For the reasons set forth in the Court's review of entry 63, entry 74 is protected by the attorney-client privilege.

Entry 75 is a repeat of portions of entries 59-60.  For the reasons set forth in this Court's review of entries 59-60, entry 75 is protected by the attorney-client privilege.

---

[17] Pursuant to the Court's June 1, 2023, text order, directing USS to provide a corrected privilege log and privilege log entries for entries 74-84, on June 9, 2023, USS submitted these documents for in camera review.  The Court's review of documents 74-84 are based on the amended privilege log and entries.

Entry 76 is a portion of an e-mail from the e-mail chain in entry 74. For the reasons set forth in review of entry 74, entry 76 is protected by the attorney-client privilege.

Entry 77 is an e-mail chain from Howard Jacobs to Ted Morris and Katy Freeman. Entry 77 involves the solicitation of legal advice. Accordingly, entry 77 is protected by the attorney-client privilege.

Entry 78 is an e-mail from Ted Morris to Howard Jacobs indicating that the e-mail he is sending has attachments from the Sidley Austin investigation and 1990 NMU investigation. It also provides information from Mr. Morris to Mr. Jacobs that relates to the solicitation and/or receipt of legal advice. Further, entry 78 includes the USS' commentary on one of the attachments. The attachments have not been provided to the Court as part of this in camera review. However, as entry 78 involves the solicitation and/or receipt of information relevant to legal advice, it is protected by the attorney-client privilege.

Entry 79 is an e-mail chain involving Howard Jacobs to Ted Morris, carbon-copied to Katy Freeman. One portion of entry 79 is a repeat of entry 78. Other portions from the e-mail chain also involve the solicitation and receipt of legal advice. Accordingly entry 79 is protected by the attorney-client privilege.

Entry 80 is an e-mail chain from Ted Morris to Scott Dubois and to Dale Schoon of USS, which also includes e-mails from Richard Janisch of Aon to Nikki Warren and Devyn Brody of Aon and Mark Hatley of Arcina Risk, and from Dale Schoon to Taylor Mahoney of Riverstone carbon copied to Richard Janisch and Scott Dubois. USS fails to demonstrate that this e-mail chain, is protected by the attorney-client privilege. The

e-mail between Mr. Schoon and Mr. Morris discusses a desire to speak with Mr. Dubois about the subject matter of the communications with the insurance carrier, but USS has not shown that a communicated desire or intention to solicit legal advice, when that communication is not made between client and counsel, amounts to an attorney-client privileged communication.  Although Mr. Morris refers in his e-mail to Mr. Dubois to a document that may be the subject of a future discussion between the pair, the e-mail does not include the document, indicate the nature of the review or advice sought, or reveal any client confidences.  Much of the e-mail, to the extent it is between Mr. DuBois and Mr. Morris, discusses scheduling.  As the remainder of the e-mail chain is not comprised of e-mails between counsel and client, but between client and athird party, USS has failed to demonstrate that entry 80 is attorney-client privileged.

Entry 81 is an e-mail from Ted Morris to Logan Cooney which forwards an e-mail that Mr. Morris received from Howard Jacobs, carbon-copied to Katy Freedman.  The e-mail between Mr. Jacobs and Mr. Morris references an attachment, but the attachment is neither included nor visible in entry 81.  The e-mail between Mr. Jacobs and Mr. Morris does not reveal any client confidences and does not involve the giving or receiving of legal advice.  Indeed, it merely advises the client that a motion was filed and directs him to review an attachment.  The e-mail from Mr. Morris to Mr. Cooney does not contain any commentary beyond forwarding the e-mail and bringing it to Mr. Cooney's attention.  Further, there is nothing confidential about the fact that a motion was filed in this case as such information is publicly available on the Court's docket. Although it references the existence of a filing in this case, there is nothing in the e-mail that reveals confidential attorney-client communications or can be interpreted as any

legal advice or commentary on the document to which it refers.  Therefore, USS has failed to demonstrate that entry 81 is protected by the attorney-client privilege.

Entry 82 is an e-mail chain initiating from Nikki Warren of Aon to Dale Schoon of USS, carbon-copied to Devyn Brody of Aon.[18]  Mr. Schoon forwards the initial e-mail to Ted Morris.  Ted Morris forwards Mr. Schoon's e-mail to Scott Dubois.  The e-mail chain relates to an insurance policy and the final e-mail in the chain solicits legal advice.  The Court finds that the final e-mail of the chain, from Ted Morris to Scott Dubois, dated June 1, 2021, is protected by the attorney-client privilege inasmuch as it solicits legal advice, but that the remainder of the e-mail is not attorney-client privileged.

Entry 83 is an e-mail chain that appears to originate with an e-mail from Jen Nilmeier, presumably[19] to Erik A. Christiansen, and then from Erik Christiansen to Steve Smith, carbon-copied to Richard Mrazik.  The e-mail appears forwarded a third time, but the "To/From" and date of this final e-mail are not shown in entry 83.  There is then an e-mail from Russell C. Fericks of "RBMN" to Steve Smith of Bryan Cave, carbon copied to Erik Christiansen of Parsons Behle and Marty Wolfinshon.  Finally, this e-mail is forwarded from Steve Smith to Lucinda McRoberts.  USS does not explain who these individuals are, but contextual clues suggest that Mr. Christiansen is an attorney for Coach Yeo.  USS fails to demonstrate how this e-mail chain amounts to attorney-client privilege or who would hold the privilege in relation to this e-mail chain.  Accordingly, USS has not met its burden of demonstrating privilege with respect to entry 83.

---

[18]  The privilege log does not accurately reflect that the e-mails involve and originate from Aon employees.

[19] The recipient is cut off, but it appears that the e-mail was, at this stage in the chain, sent to Erik A. Christiansen.

Entry 84 is a version of entry 83. The only differences between entry 83 and entry 84 are (1) that some of the e-mails on the chain that are a part of entry 83 are not included in entry 84; and (2) entry 84 has one additional e-mail, from Jennifer Nilmeier to Erik Christensen.[20]  For the reasons set forth in this Court's review of entry 83, USS has failed to demonstrate that the attorney-client privilege applies to entry 84.

## B.  Attorney Work Product

Plaintiff argues that the sole purpose of a document must be in anticipation of litigation for it to be designated as attorney work product.  See Dkt. No. 135 at 4.  By contrast, USS argues that legal advice in anticipation of litigation must be a primary purpose or one of the significant purposes.  See Dkt. No. 123 at 10.  Further, plaintiff argues that because the statute of limitations to bring a civil action had expired and plaintiff was not seeking criminal prosecution, USS could not have anticipated litigation. See Dkt. No. 116-1. By contrast, USS argues that "litigation" encompasses arbitration, and argues that they had pending Section 9 and Section 10 complaints, one of which – although not filed by plaintiff – mentioned plaintiff's allegations against Gabel. USS claims the work product privilege for entries 2, 8-35,[21] 37-38, 40, 43-60, 63-72, 74-82.

---

[20]  It appears that the "From" and "Sent" lines of this e-mail were included in entry 83, but not the body of the e-mail.

[21] Entries 8-35 are defined in the privilege log as "[i]nternal memorandum, reflecting attorney work product related to Plaintiff's March 2013 allegations."  Privilege log entries 8 through 35 are interview summaries, stylized as memoranda, of various people connected to USS speedskating about their knowledge or understanding of plaintiff's allegations against Gabel.  These memoranda are largely factual recitations of the interviews, reflecting the interviewees' knowledge or memories of plaintiff, Andy Gabel, and another former USS member who made allegations against Gabel; knowledge, if any, about USS policies/procedures that may have been in place at various points in time; and any recommendations the interviewee may have had for who else could be interviewed with knowledge on those topics.  Some of the memoranda include the attorneys' impressions as to the interviewees' demeanor, their truthfulness, how forthcoming they were, or their level of helpfulness.  These interview summaries were separately reviewed as part of the Court's attorney-client privilege assessment, supra.

As with assessing the attorney-client privilege, the Court determines that an in camera review is required to assess attorney work product as the privilege log is not sufficiently detailed such that the Court can otherwise make that determination.[22]  Upon reviewing USS' in camera submission, Court agrees with USS that

> Sidley was requested to provide and provided its legal conclusions regarding (1) Sidley's opinion regarding the validity of the sexual misconduct allegations made by Plaintiff and others against Defendant Gabel; (2) Sidley's opinion regarding USS' knowledge of Gabel's alleged sexual misconduct during the relevant time period; and lastly, (3) Sidley's opinion regarding whether USS had the proper procedures in place to ensure a safe environment for athletes moving forward.

Dkt. No. 123 at 21.[23]  The Court further agrees that in camera review demonstrates that among the primary purposes of the Sidley investigation and report was to assess the "validity" of plaintiff's allegations against Gabel and USS and USS' knowledge of Gabel's alleged conduct.  However, given that the relevant statute of limitations had run at the time, the Court recognizes and agrees with plaintiff that USS could not have anticipated litigation in the traditional sense.  Thus, whether the Court assesses the Sidley investigation as an "internal investigation" or otherwise, the Court must determine whether administrative proceedings or arbitration amount to "litigation" under Rule 26(b)(3).  Mount Sinai Hosp., 185 F. Supp. 3d at 389-90.

---

[22] Contrary to USS' contention, the Court does not conclude that the Sidley retention letter, from its face and without more, proves that the "purpose"/ "primary purpose" of the Sidley investigation was in anticipation of litigation.  However, the letter also does not indicate that the primary purpose was an assessment as to whether there were appropriate policies or procedures in place to ensure members' safety.  Ultimately, though, a review of the full report and investigation file does assist in addressing this question.

[23] The Court does not agree, however, that the Sidley Austin engagement letter, examined in camera, alone establishes that Sidley Austin was engaged "solely" or "primarily" in anticipation of litigation. However, in the Court's opinion, it also does not demonstrate that Sidley Austin was engaged solely to "determine whether or not USS had the appropriate policies in place to ensure a safe environment for USS members."  Dkt. No. 123 at 13-14.  Indeed, the language of the engagement letter is broad and nonspecific, and does not, alone, weigh more in favor of either argument.

USS contends that litigation under Rule 26(b) "is broader than Plaintiff implies" and includes "other adversarial proceedings, such as administrative hearings, arbitration, and grand jury proceedings."  Dkt. No. 123 at 13 (citing In re Freight Ruel Surcharge Antitrust Litig., 268 F.R.D. 114, 118 (D.D.C. 2010)); In re Apollo Grp., Inc. Sec. Litig., 251 F.R.D. 12, 16-17 (D.D.C. 2008)).  USS contends that at the time Sidley Austin was investigating the Gabel allegations, "USS was in receipt of a number of Section 9 and 10 Complaints and USS member grievances," which amount to "administrative proceedings and/or arbitration proceedings," and notes that one such member grievance "filed by athlete Eva Rodansky and several other athletes, specifically referenced Plaintiff's allegations against Gabel."  Dkt. No. 123 at 15.  USS also refers to plaintiff's April 2, 2014, e-mail[24] to Ted Morris and Mike Plant of USS "which tie her allegations a year earlier to the 'risk of a lawsuit.'"  Id.

USS has identified no caselaw in this Circuit addressing if, or when, arbitrative or administrative proceedings fall within the "anticipation of litigation" umbrella nor has the Court been able to find any such cases.  The cases on which USS focuses in support of its argument are two district-level cases out of the District of Columbia.[25]  It appears that the out-of-Circuit cases that address this issue, largely indirectly, hold in some circumstances that arbitration or adversarial administrative proceedings can be characterized as litigation within the meaning of Rule 26(b)(3).  See, e.g., Bauman v. Am. Commerce Insur. Co., C15-1909-MJP, 2016 WL 11627693, at *3 (W.D. Wa. July 5,

---

[24] Plaintiff's April 2, 2014, e-mail to Ted Morris and Mike Plant is docket number 110 at 99.

[25] The few cases that address the attorney-client privilege in arbitration contexts from within this Circuit that the Court could locate in its research appear to involve patent matters. See, e.g., Golden Trade, S.r.l. v. Lee Apparel Co., No. 90 CIV. 6291 (JMC), 1992 WL 367070, at *4 (S.D.N.Y. Nov. 20, 1992). As patent cases involve very distinct issues and are not typically considered adversarial proceedings, the Court does not find these cases instructive.

2016) (quoting <u>Samuel v. Mitchell</u>, 155 F.R.D. 195, 200 (N.D. Cal. 1994) (noting that

arbitrations, which are "adversarial in nature" can be "fairly characterized" as litigation

under Rule 26(b)(3)" and that documents used in preparation for arbitrations "should

ordinarily be protected by the work product doctrine.")); <u>In re Rail Freight Fuel</u>

<u>Surcharge Antitrust Litig.</u>, 268 F.R.D. 114, 118 (D.D.C. 2010).  The U.S. District Court,

District of Columbia, has also addressed this question, relying on a decision of the

Federal Court of Claims:

> The Federal Court of Claims has carefully parsed the adversarial and non-adversarial aspects of certain administrative proceedings, and determined that "documents that were created 'with an eye towards' adversarial aspects of administrative proceedings . . . and that would not have been created in similar form but for these adversarial aspects, should be afforded protection as documents created 'in anticipation of litigation' under the work product doctrine of RCFC [Rules of the Court of Federal Claims] 226(b)(3)."[26] <u>Pacific Gas and Elec. Co. v. United States</u>, 69 Fed.Cl. 784, 808 (Fed.Cl.2006).

<u>In re Rail Freight Fuel Surcharge Antitrust Litig.</u>, 268 F.R.D. 114, 117-18 (D.D.C. 2010);

<u>Wilkinson v. Greater Dayton Reg'l Transit Auth.</u>, No. 3:11-CV-00247, 2014 WL 953546,

at *5 (S.D. Ohio Mar. 11, 2014) (citing <u>U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers</u>,

2002 WL 31093619 (S.D.N.Y. Sept.17, 2002)).

The Court agrees with this line of cases insofar as they hold that, in some

circumstances, arbitration and adversarial administrative proceedings can be

considered "litigation" within the realm of Fed. R. Civ. P. 26(b)(3) for purposes of

considering attorney-client and work product privilege matters.  However, the Court

finds that such proceedings must include a "significant adversarial aspect" and it must

be shown that document would not have been otherwise prepared if not for the

---

[26]   The Court takes notice that this case relies on the Rules of the Court of Federal Claims.

anticipation of litigation.  In re Rail Freight Fuel Surcharge Antitrust Litig., 268 F.R.D. at 117-18.

USS appears to suggest[27] that it engaged Sidley Austin to investigate plaintiff's allegations against Gabel because it was anticipating "litigation" by plaintiff via a member grievance, Section 9, or Section 10 complaint.  USS seems to contend that it was anticipating such an action from plaintiff at least in part because it had recently received "several" member grievances, Section 9 complaints, or 10 complaints close in time to plaintiff's 2013 public allegations, and one such grievance "specifically referenced Plaintiff's allegations against Gabel." See Dkt. No. 123 at 15.

USS fails, within its briefing, to provide a detailed explanation of member grievances, Section 9 complaints, and Section 10 complaints; however, it has referred the Court to documents annexed to a prior filing, including USOPC Bylaws.  See Dkt. No. 110 at 4 n.1-3.  The only information USS has provided about member grievances is as follows: "US Speedskating's own bylaws also provide mechanisms for members to file grievances to be heard by appointed hearing panels in an administrative proceeding."  Dkt. No. 110 at 4 n.3.  The Court has independently reviewed the Amended and Restated Bylaws of Speedskating, effective December 5, 2022.[28]  The USS Bylaws provide that a member who has a grievance against US Speedskating (14.8-13.10) must submit a form in writing on the US Speedskating website, remit a $100 filing fee, submit the grievance within 120 days "of the date that the Complainant

---

[27]  USS does not explicitly state as such, instead arguing, generally, that "litigation" includes administrative proceedings and arbitration and noting that, at the time it engaged Sidley Allen, it was in receipt of several Section 9, Section 10 complaints and USS member grievances.  Dkt. No. 123 at 15.
[28] Through the Court's independent research, it was able to obtain a copy of the USS "Amended and Restated Bylaws of U.S. Speedskating" from the USS website.  Absent any indication from USS otherwise, the Court assumes for purposes of this motion that the 2022 version of the USS Bylaws is substantially similar to the version in effect in 2013.

knows, or reasonably should have known, of the facts giving rise to the Grievance[.]"
USS Bylaws at 37 § 14.8.  The Executive Director "may seek to mediate the dispute
with the Complaint" "[w]here appropriate."  Id. at 383 § 14.10. The Executive Director
forwards to "the Chair of the Judicial Committee" any properly-filed and paid for
grievance form.  Id.  Within ten days of receipt of a grievance against US Speedskating,
"the Chair of the Judicial committee" reviews the complaint for any deficiencies and
"shall commence the process for a Hearing in accordance with Sections 14.15-14.28 of
these Bylaws."  Id. at 38 § 14.9.  The Chair of the Judicial Committee appoints a hearing
panel "consisting [of] three (3) disinterested and impartial individuals, at least one of
whom must be an athlete meeting the definition for 'Elite Athlete' as set forth in Section
5.1(A)(i) of these Bylaws."  Id. at 39 §14.15.

Within ten days of the appointment of the hearing panel, the Executive Director
provides to the Chair of the Hearing Panel copies of the complaint, any materials filed
with the complaint, any "written response or other materials previously submitted by the
Respondent(s), if any[,]" and "any relevant documents in the possession of US
Speedskating." USS Bylaws at 38 § 14.17.  The hearing panel will provide these same
materials to the parties and any persons the hearing panel may deem to be "affected
parties."  Id. at 40 §§ 14.18, 14.8(A).  The hearing panel may dismiss a complaint "if it
determines that the Complaint is not appropriate for the Hearing process, including
without limitation a lack of jurisdiction or inappropriate subject matter for the Grievance
Policy."  Id. at 40 § 14.18(B).  The hearing panel determines "whether, and to what
extent, discovery and exchange of documents will be allowed or required, subject to the
understanding that the Hearing process is meant to be efficient and streamlined." Id. at

40 § 14.19.  The minimum standards for the hearing "include the opportunity for each

party to (i) be represented by counsel (at that party's expense), (ii) present oral or

written evidence, (iii) cross-examine witnesses, and (iv) present such factual or legal

claims as may be relevant to their respective claim(s) or defense(s)."  Id. at 41 § 14.22.

The testimony of witnesses is taken under oath, and the "rules of evidence applicable to

court proceedings shall not be strictly enforced, but the Panel shall give lesser weight to

hearsay testimony, if admitted into evidence."  Id. § 14.23.

As relevant here, the burden of proof is held by the complainant under a

preponderance of the evidence standard, defined as "superiority in weight of evidence

that is more convincing (even if minimally) than the evidence presented by the other

party."  USS Bylaws § 14.25.  "Decisions on the merits of the Grievance and the form of

remedies, including the nature and extent of discipline, shall be determined by a

majority vote of the Hearing Panel."  Id. at 41 § 14.26.

> Without limiting the ability of a member who is claiming that (i) his or her opportunity to participate has been denied to avail himself/herself of the process set forth in Section 9 of the USOPC Bylaws, (ii) US Speedskating is not in compliance with the requirements of Section 8 of the USOPC Bylaws and/or §§ 220522-220525 of the Sports Act as described in Section 10 of the USOPC Bylaws, and/or (iii) US Speedskating's recognition as a National Governing Body should be revoked as set forth in Section 11 of the USOPC Bylaws, a decision made by the Hearing Panel shall be final and binding and may not be appealed within US Speedskating.

Id. at 40 § 14.28.

As a threshold point, USS has failed to sufficiently explore or demonstrate to the

Court how: (1) member grievances and Section 9 complaints – which involve a USS

member's inability to participate in a competition – relate to plaintiff's public claims

against Gabel or USS' anticipation of "litigation" in connection with her allegations; or

(2) a member grievance/Section 10 complaint filed by other USS members, not including plaintiff, would allow them to reasonably anticipate "litigation" stemming from plaintiff's sexual abuse allegations.  See Dkt. No. 123 at 7 n.1.

Based on the information provided, the Court first concludes that member grievances filed pursuant to USS Bylaws do not rise to the level of "litigation" within the meaning of Rule 26(b)(3).  As discussed herein, the hearing panel is solely responsible for determining whether to permit discovery and the extent of discovery; to make evidentiary determinations; and with the exception of grievances relating to USOPC Section 9 and Section 10 complaints, the hearing panel determination for member grievances is final, binding, and unappealable.  There is no provision permitting arbitration for dissatisfied complainants with respect to member grievances.  Significantly, USS Bylaws for member grievances indicate that a member must submit the grievance within 120 days "of the date that the Complainant knows, or reasonably should have known, of the facts giving rise to the Grievance[.]" USS Bylaws Section at 37 § 14.8.  As plaintiff alleged the abuse to have happened in approximately 1997-1998, under USS Bylaws she would have been time-barred from filing a member grievance relating to her allegations by the time she made her public statement in 2013.

Section 9 and 10 complaints pursuant to the USOPC Bylaws[29] have similar limitations.  USS contends that Section 9 "of the USOPC Bylaws allows a member of US Speedskating who believes that she has been denied the opportunity to participate in a Protected Competition . . . to arbitrate her dispute with US Speedskating in a

---

[29] USS provided USOPC Bylaws effective as of June 18, 2020.  The Court is unaware whether the Bylaws were substantially similar in 2013 when USS engaged Sidley Austin to commence an investigation into plaintiff's allegations against Gabel.

binding arbitration administered by the American Arbitration Association."  Dkt. No. 110 at 4 n.1.  However, this statement is not a complete picture of the Section 9 process.  First, after filing a complaint, "the corporate Dispute Resolution team and the Athlete Ombudsman will review the complaint, seek information from the parties as to the merits of the complaint, and determine whether the complaint can be informally resolved to the satisfaction of the parties."  Dkt. No. 110 at 53 § 9.6.

Review of the USOPC Bylaws further reveals that parties associated with a Section 9 complaint may seek to proceed to arbitration "[i]f the complaint is not settled to the athlete's satisfaction" following this attempt at informal resolution.  Dkt. No. 110 at 53.  The USOPC Bylaws provide, however, that "[t]he corporation has the right to participate in the arbitration proceeding, <u>but it cannot be involuntarily joined by a party</u>."  Dkt. No. 110 at 53.

Further, given that Section 9 complaints are related to the member's ability to participate in the sport, the Court is at a loss for how Section 9 complaints are relevant to USS' arguments here.  It would not appear that there would be any reasonable and realistic risk that plaintiff would file a Section 9 complaint against USS in connection with her allegations against Gabel.  Regardless, even if USS had demonstrated that there was a reasonable risk that plaintiff would file a Section 9 complaint in connection with her sexual abuse allegations, the Court concludes that USS has not demonstrated that Section 9 complaints involve significant adversarial aspects to amount to litigation under Rule 26(b).  First, USS fails to show that the "informal resolution" process of a Section 9 complaint involves a significant adversarial aspect.  Second, given that USS is not required to proceed to arbitration when a complainant is dissatisfied with the informal

resolution process, it cannot be said that Section 9 complaints involve a significant

adversarial aspect.  This is because a Section 9 complainant is not guaranteed that she

will be permitted to proceed to a binding arbitration given that USS cannot be enjoined

to arbitrate.

Section 10 complaints also fail to amount to "litigation" under a Rule 26(b)(3)(A)

analysis for similar reasons.

> Section 10 of the USOPC Bylaws allows a member of US Speedskating to
> bring an administrative action, culminating in a hearing administered by
> the USOPC's dispute resolution division, whereby the member can ask
> (inter alia) that US Speedskating be (i) compelled to comply with the
> requirements of the Ted Stevens Olympic and Amateur Sports Act; or (ii)
> be decertified by the USOPC as the recognized National Governing Body
> for the sport of speedskating.

Dkt. No. 110 at 4 n.2.  The USOPC Bylaws provide, once a Section 10 complaint is

filed, a hearing panel will be appointed "by the Chair in consultation with ACC and

NGBC leadership," consisting of "one member of the Board, one individual who is a

member of the NGBC and one individual who is a member of the ACC."  Dkt. No. 110 at

56.  Parties can request mediation.  Id.  The hearing panel "will set such timelines and

other rules regarding the proceeding, and the conduct of the hearing, as it deems

necessary."  Id.  The respondent can file motions to dismiss or an answer and parties

can request a preliminary hearing.  Id. at 57.  The hearing panel can "direct production

of documents and other information."  Id.  Where a complaint has not been dismissed,

the panel holds "a hearing on the merits of the complaint," where "all parties will be

given a reasonable opportunity to present oral or written evidence, to cross-examine

witnesses, and to present such factual or legal claims as desired.  Rules of evidence

generally accepted in administrative proceedings will be applicable," and it is the

hearing panel that determines "the admissibility, relevance, and materiality of the evidence offered." Id.  The hearing panel may also question witnesses.  Id.

The complainant bears the burden of proof by a "preponderance of the evidence," and respondent "will then have the burden of going forward with evidence in opposition to the complaint and in support of respondent's position."  Dkt. No. 110 at 58.  When the hearing panel believes the National Governing Body ("NGB") is not in compliance with "Section 8 of these Bylaws and/or Sections 220522-220535 of the Act" it will "make a recommendation to the Board either to place the NGB on probation or to decertify the NGB," but where the hearing panel finds that the NGB's non-compliance can readily be rectified, then, prior to making a recommendation to the Board, the hearing  panel may issue an order directing that the NGB take such action as is appropriate to correct the deficiency, and if such deficiency is corrected, the hearing panel may then make a finding of compliance.  Id.  Where the Board receives a notification of noncompliance, the Board determines probation "not to exceed 180 days" or to decertify the NGB.  Id. at 59.  The Board "will consider the recommendation of the hearing panel, but is not bound by it."  Id.  Parties have "no right of appeal to any other body of the corporation from a decision of the hearing panel or from a remedy imposed by the Board."  Id.  A party

> that considers itself aggrieved by a decision of the hearing panel on the merits of the complaint or by a remedy imposed by the Board may, within 30 days after such decision or imposition of remedy, file a demand for arbitration with the arbitral organization designated by the Board.  The corporation has the right to participate in the arbitration proceeding, but it cannot be involuntarily joined by a party.

Id.

The Court cannot conclude that member grievances brought pursuant to the USS Bylaws or Section 9 and Section 10 complaints brought pursuant to the USOPC Bylaws rise to the level of litigation within the confines of Rule 26.  Significantly, for Section 9 and 10 complaints, the complainant does not have a right to appeal and cannot compel the athletic organization to attend arbitration if they are unsatisfied with the informal dispute process.  Further, for Section 10 complaints, the hearing panel makes a recommendation to the Board, which the Board can reject.  The inability of a complainant to enforce an adversarial process that is binding on both parties is determinative here.[30]  Although USS Stylizes Section 9 and Section 10 complaints as binding arbitration, that is not the case if the organization declines to proceed to arbitration.  Accordingly, given that Section 10 complaints result in a mere recommendation to the Board and that for both Section 9 and Section 10 complaints the complainant is not guaranteed the ability to proceed to a binding arbitration, the Court declines to conclude that the Sidley Report or investigative file is protected attorney work product because USS has failed to demonstrate that member grievances and Section 9 and 10 complaints amount to "litigation" under Rule 26(b)(3).

In addition to determining that USS failed to demonstrate that a member grievance or complaint filed pursuant to Sections 9 or 10 of the USOPC Bylaws rises to the level of litigation for purposes of Rule 26(b)(3), the Court concludes that USS also failed to demonstrate that the investigation and Report would not have been completed absent the prospect of litigation.  In camera review of the Sidley Austin investigative file

---

[30] The Court acknowledges that the few Courts that have reviewed whether administrative or arbitrations amount to litigation under Rule 26(b)(3) do not appear to address the narrower question here, where the administrative hearings result in recommendations that can be rejected, cannot be appealed, and that the complainant cannot enjoin the respondent in arbitration.

reveals that legal implications were not USS' sole concern and the investigation's purpose was multi-faceted.  Further, although plaintiff made a public statement in 2013 regarding her allegations against Gabel, she did not indicate a desire to file a member grievance or Section 10 complaint.

Thus, even if the Court had concluded that member grievances or Section 9 and Section 10 complaints were considered litigation within the meaning of Rule 26(b), USS also fails to demonstrate that the Sidley Report/investigation would not have been undertaken if not for the prospect of litigation. At the time USS engaged Sidley Austin, there may have been the "remote prospect" that plaintiff would file a grievance or complaint, but USS failed to meet its burden of proving that the Report and investigation was "prepared [] <u>because</u> of the prospect of litigation or that some articulable claim, <u>likely</u> to lead to litigation, had arisen."  <u>See</u>, <u>e.g.</u>, <u>Pacific Gas & Elec. Co. v. U.S.</u>, 69 Fed. Cl. 784, at 796 (internal citations omitted).  Further, as discussed above, plaintiff would be time-barred from filing a member grievance relating to events occurring in 1997-1998; thus, USS cannot validly claim that plaintiff filing a member claim was anything more than a "remote" prospect at the time they engaged Sidley Austin in 2013. <u>Hayner Hoyt Corp.</u>, 2018 WL 5811427, at *3.  In sum, due to the multiple layers of concerns that USS had surrounding plaintiff's allegations against Gabel, the Court cannot determine that USS would not have engaged Sidley Austin to investigate and create a report absent the prospect of plaintiff filing a member grievance, Section 9 complaint, or Section 10 complaint.  Accordingly, the Court concludes that USS has failed to meet its burden of demonstrating that entries 2, 8-35, 37-38, 40, 43-60, 63-72, 74-82 are protected attorney work product as they have not demonstrated that these

documents were prepared in anticipation of litigation or that it would not have been

created absent the prospect of litigaiton.


C. **Waiver**

As the Court has held that certain communications are protected by the attorney-

client privilege, it will next address plaintiff's arguments regarding waiver.  As noted,

plaintiff argues that any privilege has been waived because evidence suggests that

USS revealed the Sidley Report, portions, or "the substance" thereof to W. Scott Lewis

and the Board of Directors.  See Dkt. No. 116-1 at 28; Dkt. No. 135 at 10.  USS denies

providing the Sidley Report to Mr. Lewis or the Board of Directors, stating that Mr. Lewis

"considered statements provided by Bridie Farrell and Andy Gabel but was not provided

with a copy of the Sidley Report."  Dkt. No. 123 at 19.  USS does not make clear, nor

does an in camera review reveal, whether the "statement provided by Bridie Farrell" that

Mr. Lewis revealed was plaintiff's interview memorandum conducted in connection with

the Sidley Report or a different statement.  Dkt. No. 123 at 19-20.  However, because

(1) USS already provided this memorandum to Ms. Farrell, any privilege would have

already been waived with respect to Ms. Farrell's interview memorandum, and (2) Mr.

Gabel was not interviewed in connection with the Sidley Report, Mr. Lewis' review of

statements from plaintiff and Mr. Gabel did not amount to waiver of the attorney-client

privilege with respect to the Sidley Report.

The Court concludes that the documents submitted in camera fail to demonstrate

that USS shared a copy of the Sidley Report with W. Scott Lewis.  Although there were

communications indicating that permission was requested to share a copy with Mr.

Lewis, that a copy was needed for Mr. Lewis' investigation, and that copies were requested to be provided, there is nothing to demonstrate that such copy was provided. The September 5, 2015, letter from W. Scott Lewis to Scott Dubois states that Mr. Lewis reviewed only Ms. Farrell's "recorded statement" and Mr. Gabel's May 27, 2014, letter. Dkt. No. 124-4 at 2.  Although the Court concludes that USS met its burden of demonstrating that it did not waive the attorney-client privilege by providing the Sidley Report to Mr. Lewis on the basis of the submissions provided, to the extent plaintiff seeks to depose Mr. Lewis – assuming he is available and willing – to inquire as to whether he received a copy of the Sidley Report, plaintiff will be granted leave to depose Mr. Lewis on this limited matter, paying all relevant expenses.  If plaintiff obtains such deposition, and it is revealed through the deposition that USS provided Mr. Lewis a copy of the Report, plaintiff is granted leave to renew her request with respect to Mr. Lewis and the issue of waiver.

As for the Board of Directors, although the in camera documents show that two USS board members – Tom Frank and Katie Traver – were in attendance at a fact-gathering meetings in connection with the Sidley Austin investigation[31] – nothing in the documents reviewed suggests that legal strategy or attorney-client privileged matters were revealed.  Insofar as USS contends that "USS did not provide the USS Board of Directors with either the Sidley Report or any of the related documents," Dkt. No. 123 at 20, and in camera review has not shown otherwise, the Court agrees that USS has not waived the attorney-client privilege by providing the Board with physical copies of the Sidley Report or related documents.  However, the Court does not have before it

---

[31] See privilege log entries 37-38.

sufficient information as to whether Board members were in attendance when the Sidley Austin Report was presented[32] or the extent to which Board members were provided verbal summaries of the privileged portions of the Sidley Report.  Accordingly, the Court cannot decide in the abstract as to whether providing summaries or portions[33] of the Sidley Report to Board members would amount to a waiver of the attorney-client privilege as the Court has no information before it demonstrating what, if any, portion of or information regarding the privileged portion of the Sidley Report was provided to Board members.  As USS bears the burden of demonstrating that it has not waived the attorney-client privilege with respect to disclosures, In re Signet Jewelers Ltd. Sec. Litig., 332 F.R.D. at 134-35, if any, to USS Board members, USS will be provided fourteen days from the date of this Memorandum-Decision & Order to provide to the Court appropriate affirmations or declarations stating what, if any, information or communications – orally or otherwise – were provided to Board members with respect to pages 56-65 of entry 2, the Sidley Report.  If the Court does not receive this information within 14 days, USS will be required to provide pages 56-65 of the Sidley Report to plaintiff as a consequence for failing to meet its burden with respect to waiver. If USS provides this supplemental information, once received, the Court will separately determine whether USS has met its burden of demonstrating that it did not waive the attorney-client privilege with respect to pages 56-65 of entry 2 and the Board of Directors.

---

[32]  Although USS' brief provides that the Sidley Report was presented to USS Executive Director Tod Morris and USS Counsel Scott Dubois, it does not explicitly state that there were no Board members present at the presentation or that the presentation was not ever shared with the Board members.  See Dkt. No. 123 at 7.

[33]  As the Court has concluded that only the "conclusions" portion of the Sidley Report is protected by the attorney-client privilege, presumably, only whether the Board was provided summaries/details about the conclusions portion of the Report would be relevant to waiver.

## V.  **Conclusion**

Wherefore for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's Motion to Compel, Dkt. No. 116, is **GRANTED IN PART AND DENIED IN PART**:

(1) USS has demonstrated that pages 56-65 of entry 2, and entries 4-5, 36, 38, 39, 55-58, 59-60, 63, 66-67, 70, 74, 75, 76, 77, 78, 79, and portions of entry 82 as set forth herein, are protected by the attorney-client privilege, and plaintiff's motion, insofar as she seeks to compel these documents is denied; and

(2) USS has failed to demonstrate that pages 1-55 of entry 2, or entries 6-7, 40-42, 43-54, 61, 62, 64, 65, 68, 69, 71, 72, 73, 80, 81, portions of entry 82 as set forth herein, 83, or 84 are protected by the attorney-client privilege, and plaintiff's motion, insofar as she seeks to compel these documents is granted; and

(3) USS has failed to demonstrate that any of the entries in the privilege log are protected from disclosure under the attorney work product doctrine; and it is further

**ORDERED**, within twenty-one (21) days from the entry date of this Memorandum-Decision & Order, USS is to produce to plaintiff copies of all log entries, or portions of log entries, that this Court has herein concluded are not protected by privilege; and it is further

**ORDERED**, that within fourteen (14) days from the entry date of this Memorandum-Decision & Order, USS is to provide affidavits, affirmations, or declarations[34] that address what, if any, information or communications – orally or

---

[34]  These are to be appropriately sworn, where required.

otherwise – were provided to Board members with respect to pages 56-65 of the Sidley Report or any summaries of the advice provided therein, and that failure to timely comply will require USS to provide pages 56-65 to plaintiff, and if USS properly complies, the Court will review such submission and make a subsequent waiver determination with respect to pages 56-65 of entry 2, the Sidley Report; and is further

**ORDERED**, that plaintiff may seek to depose Mr. W. Scott Lewis on the limited question of whether he was provided with a copy of the Sidley Austin report, and if Mr. Lewis' willingly sits for such deposition and it is revealed that he received such a copy, plaintiff is granted leave to renew her argument with respect to Mr. Lewis and the issue of waiver of the attorney-client privilege.

**IT IS SO ORDERED.**

Dated: June 15, 2023
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge